SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-09-0019-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR1998-004885 |
| WAYNE BENOIT PRINCE, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Sally Schneider Duncan, Judge

**AFFIRMED**
_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel
          Criminal Appeals/Capital Litigation Section
          Melissa A. Parham, Assistant Attorney General
Attorneys for State of Arizona

SHARMILA ROY, ATTORNEY AT LAW                                Laveen
     By   Sharmila Roy
Attorney for Wayne Benoit Prince
_____

**P E L A N D E R**, Justice

¶1      Wayne Benoit Prince, Jr. was convicted of first degree murder of his stepdaughter and attempted first degree murder of his wife.  He was sentenced to death for the murder and to a prison term for the attempt conviction.  We have jurisdiction over this automatic appeal under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and 13-4033(A)(1)

(2010).[1]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

¶2      The pertinent facts are set forth in our first opinion in this case, *State v. Prince (Prince I)*, 204 Ariz. 156, 157-58 ¶¶ 2-3, 61 P.3d 450, 451-52 (2003).  In brief, Prince engaged in a heated dispute with his wife, Christine, beating her and repeatedly threatening to kill her and her two children; he ultimately shot and killed his stepdaughter, Cassandra, and then shot and severely injured Christine.

¶3      A jury found Prince guilty of first degree murder and attempted murder.  The trial judge sentenced him to death for the murder of Cassandra and twenty-one years in prison for the attempted murder of Christine.  We affirmed both convictions and the sentence for the attempted murder conviction, *Prince I*, 204 Ariz. at 161 ¶ 28, 61 P.3d at 455, but in a supplemental opinion vacated the death sentence and remanded the case for resentencing pursuant to *Ring v. Arizona (Ring II)*, 536 U.S. 584 (2002).  *State v. Prince (Prince II)*, 206 Ariz. 24, 28 ¶ 15, 75 P.3d 114, 118 (2003).

¶4      During the aggravation phase of the ensuing resentencing, the jurors found two aggravating circumstances: (1) Prince committed the murder in an especially cruel manner,

---

[1]     This opinion cites the current version of statutes unless otherwise noted.

2

A.R.S. § 13-751(F)(6), and (2) Prince was at least eighteen and Cassandra under fifteen years of age when she was killed, § 13-751(F)(9).  In the penalty phase, however, the jury could not reach a unanimous verdict on the appropriate sentence.

¶5        In accordance with A.R.S. § 13-752(K), a second penalty-phase jury was impaneled.  This jury found no mitigation sufficiently substantial to call for leniency and determined that Prince be sentenced to death.

## II.  ISSUES ON APPEAL

### A.    Challenges to Second Penalty Jury Process

### 1.    Ex Post Facto Violation

¶6        Under the law in effect when Prince murdered Cassandra, the judge decided whether to impose a death sentence and resolved any doubt as to the ultimate sentence in favor of life imprisonment.  *See* former A.R.S. § 13-703(E) (1997).  In contrast, § 13-752(K) provides that if the jury cannot reach a verdict at the first penalty phase, "the court shall dismiss the jury and shall impanel a new jury."  Prince claims § 13-752(K) violates the ex post facto clauses of both the United States and Arizona Constitutions by giving the state a second chance to seek a death sentence, which could not occur under the law in effect at the time of the murder.

¶7        We rejected an identical ex post facto argument in *State v. Cropper*, 223 Ariz. 522, 526 ¶ 11, 225 P.3d 579, 583

3

(2010).  Prince acknowledges that decision but claims *Cropper* violates the spirit of *Stogner v. California*, 539 U.S. 607, 611 (2003), in which the Supreme Court struck, on ex post facto grounds, a California statute authorizing the prosecution of child sex crimes after the expiration of the statute of limitations.  Prince analogizes his situation to *Stogner*, claiming former § 13-703(E) created "a statute of limitations regarding the death penalty:  once a particular sentencer had doubts about the propriety of the death penalty, the limitations period expired."

¶8      The statute in *Stogner* created new criminal liability when none otherwise existed by resurrecting crimes after their limitation periods had expired.  539 U.S. at 613.  Impaneling a second jury when the first cannot unanimously agree on a sentence creates no new liability unless a hung jury is tantamount to an acquittal.  *Yeager v. United States,* 129 S. Ct. 2360, 2366 (2009), rejected that characterization in the guilt phase for double jeopardy purposes, and *Cropper* appropriately extended *Yeager*'s reasoning to the penalty phase for sentencing purposes.  Moreover, no analogue to a hung jury exists for judges.  *See Cropper*, 223 Ariz. at 526 ¶ 11, 225 P.3d at 583 ("A judge, unlike a jury, cannot 'deadlock' on a sentencing decision[,]" and "[a] jury's decision to acquit a defendant differs from a jury's failure to reach a decision.").  Because

4

Prince offers no other compelling reason to revisit *Cropper*, we reject his ex post facto claim.

## 2. Vagueness of § 13-752(K)

¶9 Prince argues § 13-752(K) is unconstitutionally vague because it does not establish procedures governing the admission, to a new jury during the second penalty phase, of evidence of the aggravating factors previously found by the aggravation-phase jury.

¶10 Before commencing the second penalty phase, the trial court ruled that it would inform the new jury only of Prince's first degree murder conviction and of the descriptive titles and definitions of the two aggravating circumstances found by the aggravation-phase jury. The judge thus precluded either side from presenting any evidence relating to guilt or the aggravating circumstances.

¶11 The court of appeals accepted jurisdiction of the State's subsequent special action and vacated the trial court's order, ruling that the facts of the crime and aggravating factors are relevant to determining whether there is mitigation sufficiently substantial to call for leniency. *State ex rel. Thomas v. Duncan (Prince)*, 1 CA-SA 08-0042, 2008 WL 4501925, at *4 ¶ 15 (Ariz. App. May 6, 2008) (mem. decision). We denied Prince's petition for review. *State ex rel. Thomas v. Prince*, 219 Ariz. 127, 194 P.3d 394 (2008).

5

¶12      The State claims Prince is now barred from challenging the constitutionality of § 13-752 because the court of appeals' decision is the law of the case.  But we are not precluded from addressing issues in a direct mandatory appeal simply because we declined to review in the same case an interlocutory court of appeals' decision.  Our prior "denial of review does not mean we accepted the [c]ourt of [a]ppeals' legal analysis or conclusion" and "has no precedential value."  *Calvert v. Farmers Ins. Co.*, 144 Ariz. 291, 297 n.5, 697 P.2d 684, 690 n.5 (1985).  Consequently, the law of the case doctrine is inapplicable, and we thus address Prince's argument on the merits.

¶13      During the penalty phase, "the defendant and the state may present any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency."  A.R.S. § 13-752(G).[2]  Additionally, "the state may present any evidence that demonstrates that the defendant should not be shown leniency."  *Id.*  The penalty jury "shall consider as [a] mitigating circumstance[] any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death,

---

[2]    Our rules of criminal procedure prescribe a similar standard.  "The defense shall offer evidence in support of mitigation" and "[t]he state may . . . offer any evidence relevant to mitigation."  Ariz. R. Crim. P. 19.1(d)(4)-(5).  A defendant may also "offer evidence in rebuttal" of the state's proffered evidence.  Ariz. R. Crim. P. 19.1(d)(6).

including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." A.R.S. § 13-751(G). Any evidence admitted during the aggravation phase is deemed admitted at the penalty phase, as long as the penalty jury is the same jury that tried aggravation. *See* A.R.S. § 13-752(I).

¶14 As noted earlier, if the jury is "unable to reach a verdict" at the first penalty phase, "the court shall dismiss the jury and shall impanel a new jury." A.R.S. § 13-752(K). This new jury may not retry "the defendant's guilt or the issue regarding any of the aggravating circumstances that the first jury found by unanimous verdict to be proved or not proved." *Id.*

¶15 Although no provision comparable to § 13-752(I) addresses the admissibility of aggravation-phase evidence during a second penalty phase, the statutes are not vague or wholly silent on the issue. Section 13-752(G) is framed broadly and generally governs the admission of evidence at the penalty phase. Significantly, that statute prescribes only one criterion for admissibility: relevance "to the determination of whether there is mitigation that is sufficiently substantial to call for leniency." A.R.S. § 13-752(G). Subject to overarching due process considerations, *see State v. Pandeli*, 215 Ariz. 514, 527-28 ¶ 43, 161 P.3d 557, 570-71 (2007), any evidence that

7

meets § 13-752(G)'s criterion is admissible, regardless of whether the evidence was admissible at a prior stage of the trial.

¶16     Importantly, § 13-752(G) uses the phrase "mitigation that is sufficiently substantial to call for leniency," rather than simply "mitigating factors."   The former phrase contemplates liberal admission of any evidence relevant not only to the existence of mitigating factors, but also to the jury's ultimate determination of whether those factors call for leniency in sentencing.   Thus, the statute's standard for admissibility is framed in terms of the penalty-phase jury's duty to "assess whether to impose the death penalty based upon each juror's individual, qualitative evaluation of the facts of the case, the severity of the aggravating factors, and the quality of any mitigating evidence."   *State ex rel. Thomas v. Granville (Baldwin)*, 211 Ariz. 468, 472 ¶ 17, 123 P.3d 662, 666 (2005).   Jurors cannot perform that duty without knowing relevant facts about the circumstances of the murder and the aggravating factors, making aggravation-phase evidence directly relevant to whether the mitigation is "sufficiently substantial to call for leniency."

¶17     Similarly, by also allowing the state to "present any evidence that demonstrates that the defendant should not be shown leniency," § 13-752(G) permits any evidence probative on

8

that issue, subject only to due process limitations. That standard is not constrained by the existence or nature of "mitigating factors," or limited to evidence that was relevant or admissible at a prior stage of the trial.

¶18    Consequently, during a second penalty phase, the state and the defendant may introduce evidence pertaining to the aggravating circumstances previously found, subject to § 13-752(G)'s general relevance standard. The parties largely control which facts are presented to the jury about the aggravating circumstances, with the trial judge acting as a gatekeeper. *Cf. State v. Nichols (Nordstrom)*, 219 Ariz. 170 174 ¶ 12, 195 P.3d 207, 211 (App. 2008) (stating "the legislature has placed no express limits on what evidence a defendant may present" during the aggravation phase, except those limitations imposed by "the rules of evidence" (citing former A.R.S. § 13-703(B), now A.R.S. § 13-751(B))).

¶19    Our cases support this conclusion. In *State v. Garza*, we affirmed the trial court's admission of a 911 tape during the penalty phase, noting that it was relevant because the penalty jury "may consider the circumstances of the crime in its evaluation of mitigation." 216 Ariz. 56, 68 ¶ 57, 163 P.3d 1006, 1018 (2007). And in *State v. Harrod*, we held that A.R.S. § 13-751(G) does not permit residual doubt evidence during the penalty phase, but stated that the phrase "any of the

9

circumstances of the offense" in § 13-751(G) refers "to such factors, among others, as [] how a defendant committed first degree murder." 218 Ariz. 268, 280 ¶ 43, 183 P.3d 519, 531 (2008).

¶20 Our view of § 13-752(G) also comports with federal constitutional principles. At the penalty phase, the jury must make "a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 174 (2006) (citing *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (Stewart, J., plurality opinion)). Construing § 13-752(G) as generally authorizing the admission of evidence concerning the circumstances of the crime and the aggravating factors thus preserves the entire statutory scheme's constitutionality. *See Kilpatrick v. Superior Court*, 105 Ariz. 413, 416, 466 P.2d 18, 21 (1970). Because the statutes governing the second penalty phase provide sufficient guidance, we reject Prince's void-for-vagueness argument.

### 3. Constitutionality of Trifurcated Jury Proceeding

¶21 Prince challenges the trifurcation of his trial, in which separate juries tried the guilt, aggravation, and penalty phases. A defendant, however, is not entitled to have the same jury render verdicts in each phase of a capital trial. *State v. Anderson*, 210 Ariz. 327, 348 ¶ 85, 111 P.3d 369, 390 (2005).

10

Consequently, the use of different guilt and sentencing-phase juries does not violate a defendant's rights. *Id.* We extended *Anderson* in *State v. Moore*, upholding the use of different juries in the aggravation and penalty phases. 222 Ariz. 1, 17 ¶ 90, 213 P.3d 150, 166 (2009).[3]

**¶22** Prince nonetheless argues that the final penalty-phase jury in a trifurcated proceeding might not have heard all of the relevant circumstances of the crime. He repeats his claim that § 13-752(K) does not adequately guide judges on the admissibility of aggravation-phase evidence during the second penalty phase. Additionally, even if the same witnesses testify in each proceeding, Prince contends a witness's demeanor and words might change, altering how each jury perceives the same testimony.

**¶23** As explained earlier, however, § 13-752(G)'s general relevance standard governs the admissibility of evidence during a second penalty phase. If a defendant believes a trial judge incorrectly excluded admissible evidence or admitted excludable evidence at any phase, he has a remedy on appeal. And even if each jury in a trifurcated proceeding perceives the same

---

[3] In *Moore*, the penalty-phase jury also retried an aggravating factor because the first jury failed to reach a verdict on that factor. 222 Ariz. at 6, ¶¶ 13-14, 213 P.3d at 155. Thus, unlike this case, *Moore* did not involve a completely trifurcated proceeding.

11

testimony differently, that does not invariably disadvantage, and in some cases could greatly benefit, a defendant.

¶24    Most importantly, Prince does not point to any relevant evidence that was excluded from the second penalty jury's consideration because of the trifurcated proceeding.  As in *Moore*, "[s]ubstantially the same evidence was introduced at the second sentencing trial as at the . . . first sentencing trial."  222 Ariz. at 17 ¶ 90, 213 P.3d at 166; *see Anderson*, 210 Ariz. at 348 ¶ 85, 111 P.3d at 390 (noting "the aggravation and penalty phases were essentially a full-blown re-presentation of the entire case").

¶25    The federal constitution requires only that the jury "render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."  *Marsh*, 548 U.S. at 174.  As long as a state's procedures satisfy this requirement, the state "enjoys a range of discretion in imposing the death penalty."  *Id.*  Nothing about a trifurcated proceeding under § 13-752(K) deprives a defendant of a fair trial or reliable sentencing determination.  Thus, the trifurcated proceeding did not violate Prince's constitutional rights.

## B.    Aggravation Phase

### 1.    Exclusion of Jurors for Cause

¶26    Prince argues that the trial court improperly excluded

12

four jurors for cause, three because of their reservations about the death penalty and one because of his out-of-state felony conviction. We review a trial court's strikes of potential jurors for abuse of discretion. *State v. Jones,* 197 Ariz. 290, 302 ¶ 24, 4 P.3d 345, 357 (2000).

**¶27** Prince contends that jurors 18, 32, and 66 were improperly excluded because of their views on the death penalty. The court may not strike a juror because he or she "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968); *accord State v. Lynch*, 225 Ariz. 27, 34-35 ¶ 26, 234 P.3d 595, 602-03 (2010). The judge, however, may strike a juror whose views about capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 433 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The juror's views "need not be proven with 'unmistakable clarity.'" *State v. Ellison*, 213 Ariz. 116, 137 ¶ 89, 140 P.3d 899, 920 (2006) (quoting *Wainwright*, 469 U.S. at 424). Rather, in assessing whether to strike a juror, the judge must consider "the entirety of [the juror's] answers." *Lynch*, 225 Ariz. at 35 ¶ 28, 234 P.3d at 603.

**¶28** On his written questionnaire, Juror 18 stated he did

13

not oppose the death penalty and indicated he did not think capital punishment was imposed often enough. During voir dire, however, the juror changed his position, stating, "I don't believe anybody has the right to put another person to death," and "I'm still wavering on it right now. It's tearing me apart." Although the juror did not believe he could sentence anyone except a terrorist to death, he also claimed he could follow the jury instructions. But later, the juror twice stated he did not think he could impose a death sentence.

¶29 The trial court did not err in striking Juror 18. We have upheld strikes for cause when, as here, a juror expressed clear reservations about the death penalty. *E.g., Lynch*, 225 Ariz. at 35 ¶¶ 27-28, 234 P.3d at 603; *State v. Speer*, 221 Ariz. 449, 455-56 ¶¶ 27-28, 212 P.3d 787, 793-94 (2009). And we have upheld strikes when a juror is conflicted about imposing the death penalty, as Juror 18 was. *State v. Garcia*, 224 Ariz. 1, 9 ¶¶ 18-19, 226 P.3d 370, 378 (2010); *Ellison*, 213 Ariz. at 137-38 ¶ 91, 140 P.3d at 920-21. Although Juror 18 said he could vote to put a terrorist to death, a juror need not be against the death penalty in every possible case to warrant dismissal for cause. *See Wainwright*, 469 U.S. at 421; *Lynch*, 225 Ariz. at 35 ¶¶ 27-28, 234 P.3d at 603.

¶30 Juror 32 stated that he opposed the death penalty because of the possibility of putting an innocent person to

14

death, but indicated he could consider death in the case of a serial killer. Despite the juror's claims that he could follow the court's instructions, he also said it would be "tough" for him to set aside his feelings about capital punishment. And after the judge asked Juror 32 if he could consider the death penalty as an option, he said it would be "hard" for him to do so.

¶31    As with Juror 18, Juror 32 repeatedly expressed reservations about his ability to consider the death penalty, despite his statement that he could follow the court's instructions. The trial court did not abuse its discretion by striking Juror 32.

¶32    On the written questionnaire, Juror 66 stated that she opposed the death penalty except for crimes involving children and "some well-thought-out crimes." During voir dire, defense counsel asked the juror if she could consider capital punishment for the murder of a thirteen-year-old child, to which the juror responded, "That's a hard one. Basically, I don't believe in the death penalty." The juror then indicated she could return a death sentence, but it would be a "hard decision."

¶33    When the prosecutor probed the juror's definition of a "well-thought-out crime," the following exchange occurred:

    [Prosecutor]: . . . Question 57, describe your views
    on the death penalty. "Life imprisonment only, not
    death except in some well-thought-out crimes." I mean

15

this is a case where the defendant has been found guilty, having an argument with his wife, shooting his stepdaughter and killing her and then shooting the wife. Would that be your definition of a well-thought-out crime?

[Juror 66]: That was an argument?

[Prosecutor]: They were arguing first for a lengthy period of time. Then he had a gun.

[Juror 66]: No.

[Prosecutor]: What would you mean by that when you said a well-thought-out crime?

[Juror 66]: Well, something that was done, thought out for months in advance, something that when the time was right.

[Prosecutor]: So there's really advance planning?

[Juror 66]: Yes.

Moments later, the juror acknowledged that her views on the death penalty would substantially impair her performance as a juror. When the trial court probed the inconsistency in her answers, Juror 66 claimed she could consider a death sentence, but then told the prosecutor, "I really don't think I could vote for the death penalty."

¶34 When a juror "equivocat[es] about whether [she] would take [her] personal biases in the jury room[,]" the judge can reasonably conclude that her views about the death penalty will substantially impair her ability to carry out her duties as a juror. *Ellison,* 213 Ariz. at 137 ¶ 89, 140 P.3d at 920 (quotation omitted). Viewing Juror 66's answers as a whole, we

16

cannot say the trial court abused its discretion by striking her.

¶35    Prince also contends the prosecutor asked improper stakeout questions during his inquiry into Juror 66's definition of a "well-thought-out" crime. Stakeout questions "ask a juror to speculate or precommit to how that juror might vote based on any particular facts." *United States v. Fell*, 372 F. Supp. 2d 766, 770 (D. Vt. 2005) (quotation omitted) (noting that "not all case-specific questions are stake-out questions"). Here, the prosecutor merely sought to determine whether Prince's murder fit the juror's definition of a "well-thought-out crime," and thus determine whether that juror could consider the death penalty. That questioning did not seek to precommit the juror to a specific result. *See Garcia*, 224 Ariz. at 9 ¶ 16, 226 P.3d at 378 (finding no error when prosecutor asked jurors "if they could consider imposing a death sentence if a defendant had not actually shot the victim" because the questions asked jurors "if they could *consider* the death penalty in circumstances in which it is permitted under Arizona law"). And even if it did, Prince does not argue that the questioning constituted prosecutorial misconduct or precluded the trial judge from striking Juror 66 for cause.

¶36    The trial judge excluded a fourth juror, Juror 62, based on his felony conviction in Oklahoma. That juror

17

completed an eighteen-month prison sentence and said he was not under the continuing supervision of the Oklahoma courts. He did not know, however, if his civil rights had been restored. Absent any such showing, the judge found Juror 62 ineligible for jury service.

¶37    To qualify for jury service in Arizona, a person must "[n]ever have been convicted of a felony, unless the juror's civil rights have been restored." A.R.S § 21-201(3). Similarly, under Title 13, A.R.S., "[a] conviction for a felony" suspends various civil rights, including "[t]he right to serve as a juror." A.R.S. § 13-904(A)(3).

¶38    Prince argues that conviction of an out-of-state felony does not bar jury service in Arizona. Section 13-105(18) defines felony as "an offense for which a sentence to a term of imprisonment in the custody of the state department of corrections is authorized by any law of this state." Prince claims that § 13-105's definition of "felony" as requiring custody in Arizona applies to §§ 13-904 and 21-201 because both statutes address the subject of juror disqualification based on felony convictions. But § 13-105 limits its application to "this title," making Title 13's definition of felony inapplicable to a Title 21 statute.

¶39    Section 21-201 sets forth general qualifications for jury service and reflects the policy that jurors should be

18

"citizens who uphold and obey the law." *State v. Bojorquez*, 111 Ariz. 549, 555, 535 P.2d 6, 12 (1975). Applying Title 13's definition of felony to § 21-201 would disqualify from jury service only those convicted of a felony under Arizona law and exempt those convicted of a felony in federal court or another state, which would undermine the policy behind § 21-201(3).

¶40 A juror convicted of an out-of-state felony whose civil rights have not been restored is disqualified from jury service by § 21-201(3). Because Juror 62 was a convicted felon who did not aver that his civil rights had been restored, the trial court did not abuse its discretion in striking him.

## 2. Testimony of Gun Expert

¶41 Prince argues that reading a transcript of the State's gun expert's guilt-phase testimony to the aggravation-phase jury violated his Confrontation Clause rights. After a juror asked questions relating to the murder weapon, defense counsel informed the court that those questions could be answered by the gun expert. According to defense counsel, the parties originally planned to stipulate to the reading of that witness's prior testimony. Although no such stipulation occurred, defense counsel did not object when the gun expert's guilt-phase testimony was read to the jury. We therefore review Prince's claim for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

¶42    A defendant has a right to confront testimonial hearsay evidence introduced to establish an aggravating factor. *State v. Tucker*, 215 Ariz. 298, 315 ¶ 61, 160 P.3d 177, 194 (2007).  Prior trial testimony is hearsay, Ariz. R. Evid. 804(b)(1), but admissible if (1) the declarant is unavailable, and (2) "[t]he party against whom the former testimony is offered . . . had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which the party now has."  Ariz. R. Crim. P. 19.3(c)(1); *accord State v. Armstrong*, 218 Ariz. 451, 460 ¶ 32, 189 P.3d 378, 387 (2008) (citing *Crawford v. Washington,* 541 U.S. 36, 59 (2004)).

¶43    Even if reading the transcript violated the Confrontation Clause (an issue we need not decide), Prince cannot show prejudice.  The gun expert's testimony was irrelevant to the (F)(9) aggravating factor (the ages of the defendant and the victim) and did not directly relate to the core (F)(6) issue:  whether Cassandra consciously suffered physical pain or mental anguish.  Although the expert bolstered Christine's credibility by corroborating her testimony that Prince fired the gun through the pillow, two other witnesses also had testified to that fact.

¶44    Prince argues he was prejudiced because the gun-expert's testimony created confusion about whether Prince had intended to commit suicide after he fled to a vacant apartment.

20

He now claims that issue was crucial to whether he could have reasonably foreseen Cassandra's suffering, an element of the (F)(6) aggravator.[4]  Even if the expert's testimony was relevant to this issue, Prince cannot show prejudice because he did not place his mental state at issue during the aggravation phase. Neither he nor any other witness testified about his state of mind on the night of the shooting.  Prince also did not introduce any expert testimony that his mental state made him unable to reasonably foresee Cassandra's mental anguish.  *Cf. State v. Moody*, 208 Ariz. 424, 472 ¶ 226, 94 P.3d 1119, 1167 (2004) (holding that the (F)(6) aggravator was not established beyond a reasonable doubt when "*evidence was presented* that [the defendant] was in a 'dissociated state' due to psychosis") (emphasis added).  Therefore, Prince has not established fundamental error.

### 3.  Waiver of Right to Testify

¶45      Prince argues that the trial judge's failure to obtain an on-the-record waiver of his right to testify during both the

---

[4]    In the vacant apartment to which Prince fled after the shootings, police found the murder weapon, an expended shell casing, a six-inch piece of wire, and three damaged rounds of ammunition.  The gun expert testified that the gun failed to feed on several occasions during his test fires, but that did not damage the bullets, unlike the bullets found in the vacant unit.  According to Prince, his inability to cross-examine the expert in the aggravation phase limited his ability to contend that he was, in fact, suicidal.

21

aggravation and penalty phases violated his constitutional rights. A trial court need not inquire on the record whether a defendant has waived his right to testify. *State v. Gulbrandson*, 184 Ariz. 46, 64-65, 906 P.2d 579, 597-98 (1995); *State v. Allie*, 147 Ariz. 320, 328, 710 P.2d 430, 438 (1985). "[I]n an appropriate case," however, "it may be prudent for a trial court" to do so. *Gulbrandson*, 184 Ariz. at 64-65, 906 P.2d at 597-98 (declining to require an on-the-record waiver when defendant stated to trial court "he wanted to testify at the trial, but his lawyer told him it was too late").

¶46    Prince argues an on-the-record waiver was required because of his low IQ and his multiple motions to change counsel, which he claims indicated a strained attorney-client relationship. But throughout the trial, Prince never hesitated to assert his legal rights or make objections. He frequently filed pro se motions to change counsel, requested discovery materials from his lawyers, and filed an "inquiry" with the State Bar against one of his lawyers. In addition, Prince testified during the guilt phase, and nothing in the record suggests he was led to believe he could not also testify in the later phases. Had Prince wanted to testify in the aggravation or penalty phase, he could have expressed that desire, just as he made his other complaints known to the court. *Cf. State v. Tillery*, 107 Ariz. 34, 37, 481 P.2d 271, 274 (1971) ("Were

22

defendant's desires to testify in his own behalf as strong and unrelent[ing] as he now claims they were, he would not have maintained his silence throughout the entire trial. He might very easily have directed his request to the court or made motion to have his attorney removed.").

¶47    Because Prince did not invoke his right to testify, he "cannot now be heard to complain." *Allie*, 147 Ariz. at 328, 710 P.2d at 438. The trial court did not err.

**4.   Constitutionality of (F)(6) Jury Instruction**

¶48    Prince argues that the jury instruction on especial cruelty, A.R.S. § 13-751(F)(6), was unconstitutionally vague and failed to properly channel the jury's sentencing discretion. Because he did not argue that below, Prince must show fundamental error. *State v. Gomez*, 211 Ariz. 494, 499 ¶ 20, 123 P.3d 1131, 1136 (2005).

¶49    Although the (F)(6) aggravator is facially vague, it "may be remedied with appropriate narrowing instructions." *Tucker*, 215 Ariz. at 310 ¶ 28, 160 P.3d at 189; *accord State v. Hargrave*, 225 Ariz. 1, 13 ¶ 43, 234 P.3d 569, 581 (2010). The instructions must "sufficiently narrow[]" the statutory terms, *Tucker*, 215 Ariz. at 310 ¶ 28, 160 P.3d at 189, such that the sentencer has "sufficient guidance." *Walton v. Arizona*, 497 U.S. 639, 655 (1990), *overruled on other grounds by Ring II*, 536 U.S. at 589.

¶50       The trial judge instructed the jury on especial cruelty as follows:

> Concerning this aggravating circumstance, all first-degree murders are to some extent . . . cruel . . . . However, this aggravating circumstance cannot be found to exist unless the State has proven beyond a reasonable doubt that the murder was "especially" cruel . . . .   "Especially" means "unusually great or significant."   In other words, the murder must have been committed in such a way as to set the Defendant's acts apart from the norm of first-degree murder.
>
> . . . .
>
> The term "cruel" focuses on the victim's mental anguish.   To find that the murder was committed in an "especially" cruel manner you must find that the victim consciously suffered extreme mental distress or anguish prior to death.   A murder is "especially" cruel when there has been the infliction of mental suffering in an "especially" wanton and insensitive or vindictive manner.   The Defendant must know or should have known that the victim would suffer anguish.
>
> A finding of "cruelty" requires conclusive evidence that the victim was conscious during the infliction of the violence and experienced significant uncertainty as to his or her ultimate fate.   The passage of time is not determinative.

¶51       Prince claims that the reference to "the norm of first-degree murder" is vague because juries have no experience with murder and therefore no context in which to understand the "norm" of first degree murder.   Although the instruction's "norm of first-degree murder" language is often urged by defendants, who can certainly make that point in closing arguments, it is neither necessary nor particularly helpful in a jury instruction.   *See State v. Bocharski*, 218 Ariz. 476, 487-88

24

¶¶ 47-50, 189 P.3d 403, 414-15 (2008). But we have repeatedly upheld jury instructions using that phrase, and its inclusion in the (F)(6) instruction here was not fundamental error. *State v. McCray*, 218 Ariz. 252, 258-59 ¶ 26 n.3, 183 P.3d 503, 509-10 (2008); *State v. Andriano*, 215 Ariz. 497, 506 ¶¶ 42-43, 161 P.3d 540, 549 (2007); *Tucker*, 215 Ariz. at 310-11 ¶¶ 30, 33, 160 P.3d at 189-90. Prince also argues that the phrase "especially wanton and insensitive" is vague, but we have approved jury instructions using that language as well. *State v. Chappell*, 225 Ariz. 229, 237-38 ¶ 27 & n.6, 236 P.3d 1176, 1184-85 & n.6 (2010); *Anderson*, 210 Ariz. at 352-53 ¶ 111 & n.19, 111 P.3d at 394-95 & n.19. Viewed as a whole, the instruction sufficiently narrowed the (F)(6) aggravator and, therefore, Prince has not established fundamental error.

¶52     Prince next argues that the trial court erred by denying his request to give the following instruction:

> The passage of time is not determinative, but the length of time during which the victim contemplated her fate affects whether the mental anguish is sufficient to bring the first degree murder of the victim within that group of first degree murders that is especially cruel.

Because most murders involve some period during which the victim experiences fear, Prince claims, his requested instruction was necessary to channel the jury's discretion when, as here, the events occurred within a short time.

25

¶53     The judge did not err by denying Prince's requested instruction.   We have repeatedly approved (F)(6) instructions that do not contain the language Prince requested.    *E.g., Tucker*, 215 Ariz. at 310-11 ¶¶ 30-31, 160 P.3d at 189-90; *State v. Cromwell*, 211 Ariz. 181, 189 ¶ 42, 119 P.3d 448, 456 (2005); *Anderson*, 210 Ariz. at 352-53 ¶¶ 111, 113 & n.19, 111 P.3d at 394-95 & n.19.   The instruction in *Anderson* contained only the sentence "The passage of time is not determinative," the same instruction given here.   210 Ariz. at 352 ¶ 111 n.19, 111 P.3d at 394 n.19.   Although the passage of time is a relevant factor for evaluating the victim's uncertainty about her fate, *see State v. Snelling*, 225 Ariz. 182, 188 ¶ 27, 236 P.3d 409, 415 (2010), we have never required an instruction to this effect. More importantly, although proof that a victim experienced uncertainty about her fate may be sufficient, it is not a necessary element to establish that the victim consciously experienced mental pain.   *See Tucker*, 215 Ariz. at 311 ¶ 33, 160 P.3d at 190; *Ellison*, 213 Ariz. at 142 ¶ 120, 140 P.3d at 925.

¶54     Notably, the instruction required the jury to find "extreme mental distress," a phrasing that was more favorable to Prince than our case law otherwise requires.   *See Chappell*, 225 Ariz. at 237-38 ¶ 27, 236 P.3d at 1184-85 (stating "the mental or physical pain used to establish the (F)(6) aggravator" need not be "extreme").   The jury instructions adequately narrowed

26

the (F)(6) aggravator and properly channeled the jury's sentencing discretion.

## 5.  Sleeping Juror

¶55     Prince argues the trial court erroneously denied his motion for mistrial based on a juror sleeping during the aggravation phase.  When the gun expert's guilt-phase testimony was read to the jury, defense counsel informed the court that Juror 16 was asleep.  The judge gave defense counsel an opportunity to designate that juror as an alternate, but counsel deferred that decision until the next day.  Defense counsel never raised the issue again, however, and Juror 16 was among the deliberating jurors who found the two aggravators.  During the first penalty phase (which ended with a hung jury), this juror fell asleep repeatedly and the parties agreed to replace him with an alternate.  Prince then moved for a mistrial based on the juror sleeping during the aggravation phase, which the judge denied.

¶56     Because Prince failed to take curative action to remove Juror 16 when he had the opportunity to do so during the aggravation phase, he must show that the trial court committed fundamental error in denying the motion for a mistrial.  *See Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607; *cf*. *State v. Spratt*, 126 Ariz. 184, 187-88, 613 P.2d 848, 851-52 (App. 1980) (concluding defendant waived any error caused by a sleeping

27

juror when counsel "refus[ed] to take curative action" such as "enter[ing] into any stipulation concerning the sleeping juror" or making a motion).

¶57    Juror misconduct warrants a new trial if "the defense shows actual prejudice or if prejudice may be fairly presumed from the facts." *State v. Miller*, 178 Ariz. 555, 558, 875 P.2d 788, 791 (1994) (emphasis omitted).  A juror's "mere falling asleep for a short time . . . does not of itself constitute a sufficient cause for a new trial." *Whiting v. State*, 516 N.E.2d 1067, 1068 (Ind. 1987) (quotation omitted).  Nor is reversal required when, as here, no evidence shows that the sleeping juror "missed large portions of the trial or that the portions missed were particularly critical."  *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000).

¶58    No error, fundamental or otherwise, occurred here. Prince points to no specific prejudice that resulted from the juror falling asleep.  Juror 16 nodded off just once during the aggravation phase, when the gun expert's prior testimony was read.  Nothing indicates that the testimony was particularly critical (*see supra* ¶¶ 43-44) or that Juror 16 missed large portions of the trial.  Thus, prejudice may not be presumed, and the trial judge did not err by denying Prince's motion for a mistrial.

C.    **Penalty Phase**

## 1.  *Caldwell* Violation

**¶59**      Prince claims that the second penalty-phase proceeding violated *Caldwell v. Mississippi*, 472 U.S. 320 (1985), in two ways.  First, he contends the penalty-phase jury abdicated its responsibility for imposing a death sentence to the aggravation-phase jury.  Because Prince did not argue this at trial, we review for fundamental error.

**¶60**      A death sentence must be vacated if the sentencer was "led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  *Id.* at 328-29.  We have concluded that use of different juries for guilt and sentencing phases does not violate *Caldwell* as long as the sentencing jury is not misled about its role.  *E.g.*, *State v. Dann*, 220 Ariz. 351, 360-61 ¶¶ 29-30, 207 P.3d 604, 613-14 (2009); *Bocharski*, 218 Ariz. at 483 ¶¶ 19-20, 189 P.3d at 410; *cf. Anderson*, 210 Ariz. at 347-48 ¶¶ 81-86, 111 P.3d at 389-90 (noting a defendant has no absolute right to have the guilt-phase jury also determine the sentence).  Similarly, we have held that use of different juries for the aggravation and penalty phases does not violate *Caldwell*.  *Moore*, 222 Ariz. at 18 ¶ 93, 213 P.3d at 167 (stating the bifurcation of the sentencing phase into two different juries "is not substantively different from the bifurcation sanctioned under" *Dann* and *Bocharski*).

¶61     Prince distinguishes *Moore* because the penalty-phase jury in that case retried an aggravating factor, making it "no different from the aggravation phase jury" for *Caldwell* purposes.    But *Moore* approved bifurcation of the aggravation and penalty phases and did not suggest that bifurcation is permissible only if the penalty-phase jury also retries an aggravating factor.    Moreover, the record does not indicate that the penalty-phase jurors were misled or confused about their role or otherwise abdicated their responsibility for Prince's death sentence.    To the contrary, the judge instructed that jury that it alone decided Prince's fate, stating, "Your decision is not a recommendation.    Your decision will be binding.    If your verdict is that Mr. Prince should be sentenced to death, he will be sentenced to death."    That instruction "convey[s] the gravity of the [penalty] jurors' task."  *Hargrave*, 225 Ariz. at 14 ¶ 49, 234 P.3d at 582; *accord Garcia*, 224 Ariz. at 17 ¶ 73, 226 P.3d at 386.    Bifurcating the aggravation and penalty phases thus did not violate *Caldwell*.

¶62     Second, Prince argues the trial court violated *Caldwell* by refusing his request for the following instruction before the second penalty phase:

> Your individual decision is not a recommendation. Your individual decision will be binding.    If there is unanimous agreement of individual decisions for a sentence of death then Mr. Prince will be sentenced to death and you must assume that he will be executed.

30

> Your verdict cannot be changed by me or on appeal. No one can change or reverse your ultimate determination on the appropriate sentence.

¶63　　　In *Caldwell*, the Supreme Court vacated a death sentence when the prosecutor, in closing argument, told the jury its decision "[was] automatically reviewable by the Supreme Court." 472 U.S. at 325-26, 341. "[T]he uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others" violates the Eighth Amendment. *Id.* at 333. The Supreme Court, however, later made *Caldwell* "relevant only to certain types of comment[s]-those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (quotation omitted).

¶64　　　Prince acknowledges that *Caldwell* applies only to affirmative comments that mislead the jury. *See State v. Martinez*, 218 Ariz. 421, 429 ¶ 33, 189 P.3d 348, 356 (2008). He nevertheless argues that "silence regarding appellate processes may violate *Caldwell*," and that "an affirmative statement should be made that appellate review could lead to a reversal of the [death] penalty only in the most unlikely circumstances" because jurors can easily access information that could mislead them about the appellate process. No case, however, requires a jury instruction that explains the intricacies or likely results of

the appellate process.

## 2.  Victim Impact Evidence

¶65      Arizona permits victim impact evidence during the penalty phase of capital sentencing proceedings.  *See* A.R.S. § 13-752(R).  Although the Eighth Amendment "erects no per se bar" to the admission of such evidence, the Fourteenth Amendment's Due Process Clause prohibits victim impact evidence that "is so unduly prejudicial that it renders the trial fundamentally unfair."  *Payne v. Tennessee*, 501 U.S. 808, 825-26 (1991) (emphasis omitted); *accord Dann*, 220 Ariz. at 369 ¶ 98, 207 P.3d at 622.  Additionally, a victim may not recommend a particular sentence.  *Ellison*, 213 Ariz. at 141 ¶ 111, 140 P.3d at 924.

¶66      During the first penalty phase, Christine made a victim impact statement to the jury pursuant to § 13-752(R). After that jury deadlocked on the appropriate penalty and a new jury was convened for the second penalty phase, Christine did not appear, but a victim advocate read her statement verbatim to the second penalty-phase jury.

¶67      Prince argues that § 13-752(R) violates the Eighth Amendment because it does not prohibit victim recommendations for a sentence or other victim impact evidence that renders the trial fundamentally unfair.  But *Payne*, *Dann*, and *Ellison* establish that such evidence is not admissible under § 13-

32

752(R).   And Christine did not try to recommend or otherwise suggest a particular sentence.

¶68      Prince also asserts that victim impact evidence is irrelevant in the penalty phase because mitigation focuses on the defendant rather than the victim or the impact of the victim's death on others.   We have repeatedly rejected that argument.  *See, e.g., Bocharski*, 218 Ariz. at 488 ¶ 51, 189 P.3d at 415 (citing *Ellison,* 213 Ariz. at 140-41 ¶ 111, 140 P.3d at 923-24); *see also Payne*, 501 U.S. at 825 (upholding victim impact evidence as a method of "informing the sentencing authority about the specific harm caused by the crime," thus allowing "the jury to assess meaningfully the defendant's moral culpability").

¶69      Prince further contends that § 13-752(R) unconstitutionally permits evidence that "infus[es] irrelevant emotions into the proceeding."   We have rejected that argument too.  *E.g., Dann*, 220 Ariz. at 369-70 ¶ 101, 207 P.3d at 622-23. Moreover, the trial court here instructed the jury to consider the victim impact evidence "to the extent it rebuts mitigation," but not "as a new aggravating circumstance."  *See Bocharski*, 218 Ariz. at 488 ¶ 53, 189 P.3d at 415 (finding no Eighth Amendment violation when jurors instructed to consider victim impact statement "only to rebut the mitigation evidence").

¶70      Next, Prince claims his Confrontation Clause rights

33

were violated when the victim advocate read Christine's statement to the second penalty-phase jury. Because confrontation rights do not extend to the penalty phase under either the Arizona or federal Constitution, no Confrontation Clause violation occurs when a third party reads a victim impact statement to the jury during the penalty phase. *Tucker*, 215 Ariz. at 320 ¶ 94, 160 P.3d at 199.

¶71    Finally, Prince asserts that Christine's statement was unduly prejudicial in part because it was too long, comprising eight pages of transcript compared to the five-sentence statement in *Payne*. The Court in *Payne*, however, did not suggest its result turned on the short length of the statement. Indeed, courts have upheld much longer victim impact statements against claims of undue prejudice. *E.g., United States v. Nelson*, 347 F.3d 701, 713-14 (8th Cir. 2003) (six statements totaling 101 pages); *State v. Taylor*, 838 So. 2d 729, 753 (La. 2003) (eight and one-half pages).

¶72    Prince also claims that several of Christine's remarks were unduly prejudicial. Christine stated:

> Nine and a half years later and we're all still going through the same pain and trying to just figure out how to get by another day. For me, because I was there every single moment of that night is in my head 24 hours a day. I can still feel the stubble on my hands and my face. I can hear her crying when he threw her across the floor. I can hear, oh, the sound of her last breaths. I can hear her heart beating

34

when it was stopping. I can smell it. It never goes away, twenty-four hours a day, every single day.

¶73 Prince argues that the jurors could have construed Christine's reference to "nine and a half years later" as a plea for the death penalty. But that statement was in the context of Christine describing her persistent pain due to the loss of her daughter. Prince also contends that Christine improperly described details of the offense, but we have upheld similar comments. *See State v. Glassel,* 211 Ariz. 33, 53-54 ¶¶ 79, 86, 116 P.3d 1193, 1213-14 (2005); *cf. Simmons v. Bowersox*, 235 F.3d 1124, 1134-35 (8th Cir. 2001) (finding no undue prejudice when statement speculated at length about the victim's thoughts and feelings during the murder). Prince has not shown undue prejudice.

¶74 In her statement, Christine also spoke of Cassandra's ambitions to become a doctor and practice on an Indian reservation. Prince contends that a victim impact statement may not describe the murder victim's future plans, citing *Conover v. State*, 933 P.2d 904, 921 (Okla. Crim. App. 1997). *Conover* is inapposite, however, because its holding was based solely on Oklahoma's statute, not due process considerations. Moreover, a victim impact statement that "show[s] . . . [the] victim's uniqueness as an individual human being" is permissible. *Payne*, 501 U.S. at 823 (quotation omitted).

35

¶75 Courts routinely uphold statements that touch on the victim's future plans. *E.g.*, *Raulerson v. State*, 491 S.E.2d 791, 801-02 (Ga. 1997) (upholding statement describing victims' plans to marry and attend college); *State v. Rocheville*, 425 S.E.2d 32, 36 (S.C. 1993); *State v. Gentry*, 888 P.2d 1105, 1113, 1134 (Wash. 1995) (upholding statement from victim's father describing the twelve-year-old victim's plans for the future). Here, Christine did not describe Cassandra's ambitions at length or in an unduly prejudicial manner.

¶76 Finally, Prince objects to Christine's description of the impact Cassandra's death had on the family. Once again, however, we have upheld similar comments. *See Armstrong*, 218 Ariz. at 463 ¶¶ 52-53, 189 P.3d at 390 ("[The victim] ended her statement by describing how the murders negatively affected her family and [her son] in particular because he lacked a fatherly figure in his life."); *State v. Carreon*, 210 Ariz. 54, 72 ¶¶ 91-93, 107 P.3d 900, 918 (2005) (upholding statements that the victim's daughter "almost committed suicide because she felt blamed" and that the victim's son was "not going to school, hanging out with the wrong crowd [and] getting into drugs").

## 3. Jury Instructions on Mitigation

¶77 Prince argues that the jury instructions on mitigation given during the second penalty phase were inconsistent and confusing. We review de novo whether jury instructions

36

correctly state the law, *State v. Gallardo*, 225 Ariz. 560, 567 ¶ 30, 242 P.3d 159, 166 (2010), "read[ing] the jury instructions as a whole to ensure that the jury receives the information it needs to arrive at a legally correct decision," *Granville*, 211 Ariz. at 471 ¶ 8, 123 P.3d at 665 (citing *Kauffman v. Schroeder,* 116 Ariz. 104, 106, 568 P.2d 411, 413 (1977)).

**¶78** At the close of the penalty phase, the judge instructed the jury that "[m]itigating circumstances may be found from any evidence presented during this hearing." The judge then gave more specific instructions regarding mitigation:

> Mitigating circumstances are any factors that are a basis for a life sentence instead of a death sentence, so long as they relate to any sympathetic or other aspect of Mr. Prince's character, propensity, history or record, or circumstances of the offense.
>
> Mitigating circumstances are not an excuse or justification for the offense, but are factors that in fairness or mercy may reduce Mr. Prince's moral culpability.
>
> Mitigating circumstances may be offered by the defense or the State or be apparent from the evidence presented at this hearing. You are not required to find that there is a connection between a mitigating circumstance and the crime committed in order to consider the mitigation evidence.
>
> . . . .
>
> While all 12 of you must unanimously agree regarding the appropriate sentence, you do not need to unanimously agree on a particular mitigating circumstance. Each one of you must decide individually whether any mitigating circumstance exists.

37

> The defense bears the burden of proving the existence of any mitigating circumstance by a preponderance of the evidence. That is, although the defense need not prove its existence beyond a reasonable doubt, the defense must convince you by the evidence presented that it is more probably true than not true that such a mitigating circumstance exists.

¶79   Prince concedes that these instructions correctly stated the law, but argues they were likely to confuse the jury. Although the jury was instructed that the defense has the burden of proving the existence of mitigation, the jury was also told it could consider any evidence, even if adduced by the State, in making its final determination. According to Prince, "the interplay" between these instructions gave him the burden of persuasion, but not the burden of production, which is "inconceivable to the lay person not educated in the law." Prince asserts that the confusing instructions could prompt "the average juror [to] simply ignore any evidence that was not affirmatively introduced by the defense." Because Prince did not object on this ground at trial, we review for fundamental error only. *See State v. Roque*, 213 Ariz. 193, 225 ¶ 134, 141 P.3d 368, 400 (2006).

¶80   No error occurred, fundamental or otherwise. Jurors are presumed to follow jury instructions. *State v. LeBlanc*, 186 Ariz. 437, 439, 924 P.2d 441, 443 (1996). Nothing in the record suggests that the final penalty-phase jurors were confused or failed to consider any evidence that could have been mitigating.

38

Additionally, both instructions find support in Supreme Court case law. *See Marsh*, 548 U.S. at 170-71 (allowing states to place on defendants the burden of proving mitigating circumstances); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) ("[T]he sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence.") (quotation omitted).

### 4. Double-Counting of Cassandra's Age

¶81 Prince claims that because no special verdict form was used, the final penalty jury might have improperly considered Cassandra's age twice in imposing the death sentence.[5] Although a specific fact, such as the victim's age, can establish two aggravating factors, that fact cannot be "weighed 'twice in balancing aggravating and mitigating circumstances.'" *Chappell*, 225 Ariz. at 241 ¶ 48, 236 P.3d at 1188 (quoting *State v. Velazquez*, 216 Ariz. 300, 307 ¶ 21, 166 P.3d 91, 98 (2007)). In *Chappell*, the judge instructed the jury not to "consider twice any fact or aspect of the offense." *Id.* at ¶ 50; *see also Velazquez*, 216 Ariz. at 307 ¶ 23, 166 P.3d at 98.

¶82 The trial court here did not instruct the jury to refrain from counting Cassandra's age twice. But unlike

---

[5] Prince raises this point as a reason to set aside the especial cruelty finding on independent review, but his contention is better viewed as a separate point of error.

39

Velazquez, Prince did not request a specific jury instruction on this point. Indeed, Prince never raised the double-counting issue at any time. Thus, fundamental error review applies. *See Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶83 Prince cannot show error, let alone fundamental error. As he acknowledges, "it is unknown, and indeed unknowable, whether [Cassandra's] age was counted twice in imposing the death sentence." But even if the trial court erred by failing to specifically instruct the jury on this point or by not using a special verdict form, no prejudice resulted. The court's instruction defining the (F)(6) especial cruelty aggravator did not mention the victim's age. Nor did the prosecutor suggest that the victim's age is a factor in the (F)(6) analysis, unlike the situation presented in *Chappell*.

## D. Prosecutorial Misconduct

¶84 Prince alleges several instances of prosecutorial misconduct. We will reverse a conviction because of prosecutorial misconduct if "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *Anderson*, 210 Ariz. at 340 ¶ 45, 111 P.3d at 382 (quotation omitted). Because Prince never objected or moved for a mistrial on grounds of prosecutorial misconduct, we review his claims for fundamental error. *Roque*, 213 Ariz. at 228 ¶ 154,

40

141 P.3d at 403.

¶85     After shooting Cassandra, Prince shot Christine in the lower jaw.  Prince claims that the prosecutor improperly questioned Christine about her medical condition during the aggravation phase.  At the beginning of her testimony, the prosecutor sought to establish how Christine's "physical condition . . . might relate to [her] testimony."  He asked Christine about her current medical condition, and she responded that she had hepatitis C and "bullet and bone fragments in [her] brain" that may be lethal if they move.  After questioning Christine about the twenty-six medications she was taking, the prosecutor asked whether her medical condition affected her "memory or ability to testify," and she said it did not.  Moments later, Christine started crying, and the prosecutor then asked, "Do you think it's the medication that's making you cry?"  Christine said no but also stated, "Because I sat for the last nine years dealing with this and I thought it was over."  The judge sustained defense counsel's objection and instructed the jury to disregard that testimony.

¶86     Later, as Christine described the shootings, the prosecutor again asked about Christine's injuries, and after defense counsel asked to approach the bench, the prosecutor stated he would "move off of that area."  The prosecutor, however, ended his direct examination with more questions about

41

Christine's injuries, asking her where the bullet hit her and how many surgeries she had, to which the answer was forty-six.

¶87    The prosecutor's initial questions about Christine's health were not improper because they related to Christine's ability to recall events and testify.   And even if the prosecutor's other questions about Christine's health were improper, Prince has not shown prejudice.   His claim that questions about Christine's medical condition induced the jury to find Cassandra's murder exceptionally cruel is speculative at best.    Moreover, the trial court instructed the jury to disregard any questions to which objections were sustained, and "not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling."   Those instructions "sufficiently countered any negative impact" the prosecutor's questions might have had on the jury. *See State v. Atwood*, 171 Ariz. 576, 609, 832 P.2d 593, 626 (1992), *overruled on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241 ¶ 25, 25 P.3d 717, 729 (2001).

¶88    Prince alleges that, during the second penalty phase, the prosecutor improperly used the term "excuse" during his questioning of both psychiatric experts.   On cross-examination of Prince's expert, the prosecutor asked whether Prince's molestation as a teenager was "an excuse for what he did" and whether the jury was "supposed to forgive [Prince] just –

because he got mad all the time[.]" Defense counsel promptly objected, claiming the prosecutor's use of the term "excuse" implied an improper standard regarding mitigation. The judge sustained the objection. The next day, the prosecutor similarly questioned the State's expert, asking "do we normally look at antisocial personality disorder as an excuse for commission of a crime." Once again, the judge sustained defense counsel's objection.

¶89 Prince cannot show fundamental error. Even if the prosecutor's questions misstated the standard governing mitigation, the trial court immediately corrected the error by sustaining Prince's objections and instructing the jury to disregard any question and answer for which the court sustained an objection. Additionally, the court instructed the jury extensively about how to assess mitigation, stating "[m]itigating circumstances are not an excuse or justification for the offense." Any confusion about the applicable standard was cured by the jury instructions. *See State v. Newell*, 212 Ariz. 389, 403 ¶ 68, 132 P.3d 833, 847 (2006) (stating jurors are presumed to follow instructions).

¶90 During the prosecutor's second penalty-phase closing argument, he stated, "This guy's bad temper doesn't – is not mitigation that's sufficiently substantial to call for leniency. It should be aggravation. [Prince] should have learned not to

43

be blowing his stack like that." Although the prosecutor misstated the law regarding aggravation, *see* A.R.S. § 13-752(K) (stating the second penalty-phase jury shall not retry aggravation), the error was not fundamental. After the judge sustained defense counsel's subsequent objection, the prosecutor immediately corrected himself, alleviating any prejudice caused by his misstatement. Additionally, the judge instructed the jury that two aggravating factors had already been found and that the lawyers' closing arguments were not evidence, negating the remark's effect. *See State v. Morris*, 215 Ariz. 324, 336-37 ¶ 55, 160 P.3d 203, 215-16 (2007); *Anderson,* 210 Ariz. at 341-42 ¶ 50, 111 P.3d at 383-84.

¶91    Finally, Prince claims the prosecutor improperly said during the second penalty-phase closing argument that no connection existed between Prince having previously been molested and the crime:

> [The molestation] was damaging to him. It created this sexual identity crisis for him. It probably was carried over all the way until he was arrested for this crime. That was a problem for him. But you may want to consider what does that have to do with killing a 13-year-old girl?

This argument, however, was not improper. Although a connection between a defendant's proffered mitigation and the crime is not required, "the state may fairly argue that the lack of a nexus to the crime diminishes the weight to be given alleged

44

mitigation." *State v. Villalobos*, 225 Ariz. 74, 83 ¶ 39, 235 P.3d 227, 236 (2010). Prince thus has not established fundamental error resulting from any of the incidents of alleged misconduct.

¶92 Even if any individual instances of prosecutorial misconduct do not warrant reversal, we also consider whether "persistent and pervasive misconduct occurred" and "the cumulative effect." *Morris*, 215 Ariz. at 339 ¶ 67, 160 P.3d at 218 (quotation omitted). The incidents discussed above, however, do not amount to persistent and pervasive misconduct that deprived Prince of a fair trial, particularly in view of the trial court's sustaining defense objections and giving curative instructions to the jury.

### III. INDEPENDENT REVIEW

¶93 Because Prince committed the murder before August 1, 2002, we independently review the jury's findings on "aggravation and mitigation and the propriety of the death sentence." A.R.S. § 13-755(A)-(C); *see* 2002 Ariz. Sess. Laws, ch. 1, § 7 (5th Spec. Sess.). We review the record de novo and do not defer to the jury's findings or decisions. *Newell*, 212 Ariz. at 405 ¶ 82, 132 P.3d at 849.

¶94 In our review, we determine whether the evidence supports the aggravating circumstances beyond a reasonable

45

doubt.[6]  *Anderson*, 210 Ariz. at 351 ¶ 104, 111 P.3d at 393.  We "consider the quality and the strength, not simply the number, of aggravating and mitigating factors."  *State v. Womble*, 225 Ariz. 91, 103 ¶ 50, 235 P.3d 244, 256 (2010) (quoting *State v. Kiles (Kiles II)*, 222 Ariz. 25, 38 ¶ 62, 213 P.3d 174, 187 (2009)).  Although we do not require a nexus between the mitigating factors and the crime, the defendant's failure to establish a causal connection "may be considered in assessing the quality and strength of the mitigation evidence."  *Newell*, 212 Ariz. at 405 ¶ 82, 132 P.3d at 849; *accord Ellison*, 213 Ariz. at 144 ¶ 132, 140 P.3d at 927.

¶95      If we find the mitigation "sufficiently substantial to warrant leniency, then we must impose a life sentence."  *Newell*, 212 Ariz. at 405 ¶ 81, 132 P.3d at 849 (quotation omitted). Otherwise, we must affirm the death sentence.  *Id.*

## A.    Aggravating Factors

### 1.    Cassandra's Age – A.R.S. § 13-751(F)(9)

¶96      Prince was twenty-six and Cassandra thirteen years old

---

[6]    Our independent review of the aggravating circumstances is limited to the evidence presented to the jury during the aggravation phase.  Therefore, we do not consider evidence presented exclusively to the guilt-phase jury, the first, post-remand jury during the penalty phase, or the second penalty-phase jury.  *See Snelling*, 225 Ariz. at 187 ¶ 23, 236 P.3d at 414; *cf. Ellison*, 213 Ariz. at 142 ¶ 121 n.19, 140 P.3d at 925 n.19 (declining on independent review to consider evidence presented only to the guilt-phase jury and not to the sentencing jury).

46

when he murdered her. The State produced sufficient evidence to prove this uncontested aggravator.

## 2. Especial Cruelty – A.R.S. § 13-751(F)(6)

¶97    To show that a murder is especially cruel, the state must prove that "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *Snelling*, 225 Ariz. at 188 ¶ 25, 236 P.3d at 415 (quotation omitted). We "examine the entire murder transaction and not simply the final act that killed the victim." *Ellison*, 213 Ariz. at 142 ¶ 119, 140 P.3d at 925 (alteration and quotation omitted).

¶98    We have found mental anguish when a victim hears the assailant discuss the impending murder, *id.* at ¶ 121 (victims heard one assailant order the other to kill one victim); *State v. Libberton*, 141 Ariz. 132, 139, 685 P.2d 1284, 1291 (1984) (victim heard the assailants discuss killing him), or when the victim experiences "uncertainty about her ultimate fate," *Hargrave*, 225 Ariz. at 17 ¶ 70, 234 P.3d at 585 (quoting *State v. Kiles (Kiles I)*, 175 Ariz. 358, 371, 857 P.2d, 1212, 1225 (1993)). The length of time during which the victim contemplates her fate may affect whether the victim's mental anguish is sufficient to support a finding of especial cruelty.[7]

---

[7]    We have found especial cruelty when the victim suffered mental pain for a very short time. *Chappell*, 225 Ariz. at 235

47

*Prince II*, 206 Ariz. at 27 ¶ 8, 75 P.3d at 117; *cf.* *Snelling*, 225 Ariz. at 188-89 ¶¶ 29, 32, 236 P.3d at 415-16 (setting aside cruelty finding when "very little time elapsed between [the victim's] initially seeing [the defendant] and the murder"); *State v. Soto-Fong*, 187 Ariz. 186, 204, 928 P.2d 610, 628 (1996) (finding time of contemplation insufficient to support cruelty when the victims were killed in rapid succession).

¶99      The evidence establishes beyond a reasonable doubt that Cassandra experienced uncertainty about her fate, feared for her life, and consciously suffered mental anguish before being shot.  On the night of the murder, Cassandra saw and heard Prince attack and savagely beat her mother in the family's apartment.  Cassandra looked "scared."  She stood beside Christine in the living room as Prince, gun in hand, screamed and threatened to kill the entire family.  He locked a sliding glass door to prevent anyone from leaving.  When Cassandra tried to run for help, Prince threw her violently to the floor.  She was crying, "terrified," and "scared" as she said to Christine, "Mama, mama.  What are we gonna do, mama?"  At that point, Cassandra would have known that she could not escape Prince's

---

¶ 12, 236 P.3d at 1182 (finding sufficient evidence to support especial cruelty finding when drowning victim conscious for "thirty seconds to two minutes"); *State v. Van Adams*, 194 Ariz. 408, 421 ¶ 45, 984 P.2d 16, 29 (1999) (two to three minutes); *State v. Herrera*, 176 Ariz. 21, 34, 859 P.2d 131, 144 (1993) ("18 seconds to two or three minutes").

wrath.

¶100     After Christine took Cassandra into her bedroom and walked back out toward the living room, Cassandra watched Prince throw her mother into Cassandra's room and yell, "Who's gonna help you now, bitch" when Christine unsuccessfully attempted to call 911.  Prince repeated his threat to kill the family as Cassandra sat on her bed and clutched a pillow.  He grabbed the pillow and pointed the gun at Cassandra, repeating his threat and saying the last thing Christine would see was her "kids dead."  Christine then stood in front of the gun and "begg[ed] [Prince] to kill [her]," saying "Just shoot me, Wayne."  She said, "[Y]ou don't want to hurt Cassie, Wayne.  You love Cassie. . . . You don't want to hurt her."  Prince responded by hitting Christine and throwing her onto the bed beside Cassandra.  As Cassandra cowered on her bed and reached for her mother, Prince pointed the gun at Cassandra's head and shot her through the pillow.

¶101     In challenging the especial cruelty finding, Prince compares his case to *Soto-Fong*, 187 Ariz. at 204, 928 P.2d at 628, and *Snelling*, 225 Ariz. at 189 ¶ 32, 236 P.3d at 416, in which we set aside such a finding.  Unlike those cases, however, the murder here did not occur rapidly.  At least twenty minutes passed between the time Prince and Cassandra arrived home and the shooting occurred.  During that time, Prince beat Christine,

49

locked the doors, threatened to kill the family, and assaulted both Christine and Cassandra. Christine begged Prince to spare Cassandra's life. Cassandra witnessed the entire series of events, and the effect on her was clear: she was pale, crying, "scared to death," and asked her mother "what [they] [were] going to do." Considering the entire sequence of events, we find Cassandra had significant time to contemplate her fate, unlike the victims in *Soto-Fong* and *Snelling*.

¶102 Prince next points to our statement in *Prince II* that "[f]ew especially cruel findings . . . are predicated solely on an inference that the victim contemplated his or her fate." 206 Ariz. at 26 ¶ 8, 75 P.3d at 116. But later cases clearly establish that the victim's uncertainty is a sufficient, but not necessary, basis for a finding of especial cruelty. *See Tucker*, 215 Ariz. at 311 ¶ 33, 160 P.3d at 190; *Ellison*, 213 Ariz. at 142 ¶ 120, 140 P.3d at 925. And Cassandra exhibited obvious signs of mental anguish before Prince shot her.

¶103 Finally, Prince denies that he knew or should have known that Cassandra would suffer because he was in a dissociative state, making him unable to act reasonably. Nothing in the record, however, supports this claim. Neither mental health expert testified that Prince was in a dissociative state at the time of the murder, and no other evidence was presented on that point. To the contrary, the defense expert

testified that Prince knew right from wrong at that time, and the State's expert testified that Prince had time to reflect and stop himself from committing the murder.

¶104    Prince asks us to take judicial notice that individuals with borderline personality disorder also may suffer from dissociative disorders. But an appellate court may take judicial notice of a fact only if it is "so notoriously true as not to be subject to reasonable dispute." *In re Cesar R.*, 197 Ariz. 437, 440 ¶ 7, 4 P.3d 980, 983 (App. 1999) (quotation omitted). Because the subject matter involves psychiatric diagnoses and disorders, it is not appropriate for judicial notice.

¶105    The State produced sufficient evidence to establish beyond a reasonable doubt the "especially cruel" aggravator under § 13-751(F)(6).

**B.   Mitigation**

¶106    Prince presented evidence of one statutory mitigating factor and four non-statutory mitigating factors. Prince has the burden to prove mitigating circumstances by a preponderance of the evidence. A.R.S. § 13-751(C).

**1.   Significant Impairment - § 13-751(G)(1)**

¶107    If the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law is significantly impaired, it

51

constitutes statutory mitigation. A.R.S. § 13-751(G)(1). Personality or character disorders, however, usually are insufficient to establish this mitigator. *Velazquez*, 216 Ariz. at 314 ¶ 65, 166 P.3d at 105; *State v. Kayer*, 194 Ariz. 423, 437 ¶ 49, 984 P.2d 31, 45 (1999).

¶108 Prince claims his ability to conform his conduct to the law was significantly impaired on the night of the murder. Although he correctly points out that neither mental health expert opined that he had the capacity to conform his actions to the law, neither expert testified that Prince did not have that capability. Importantly, neither expert testified that Prince had entered a dissociative state when he shot Cassandra. Once again, Prince asks this Court to take judicial notice that people with a borderline personality disorder suffer from dissociative disorders, but as discussed earlier (*see supra* ¶ 104), psychiatric diagnoses are not an appropriate subject for judicial notice. Prince has thus failed to prove this mitigating factor.

## 2. Difficult Childhood

¶109 A difficult or traumatic childhood is a mitigating circumstance. *Armstrong*, 218 Ariz. at 465 ¶ 74, 189 P.3d at 392. Although the defendant need not prove a causal nexus between the mitigating circumstance and the crime, the lack of such a connection may lessen the mitigation's weight. *Id.;*

52

*McCray*, 218 Ariz. at 260 ¶ 36, 183 P.3d at 511. Difficult childhood circumstances also receive less weight as more time passes between the defendant's childhood and the offense. *McCray*, 218 Ariz. at 260 ¶ 36, 183 P.3d at 511; *Pandeli*, 215 Ariz. at 532 ¶ 72, 161 P.3d at 575.

¶110 Prince established by a preponderance of the evidence that he endured a difficult and abusive childhood. His father was an alcoholic, abusive to his wife and children and often on the run from law enforcement. As a child, Prince lived in an old barn in rural Virginia that lacked adequate heat, running water, a kitchen, or a bathroom. Prince's psychiatric expert characterized those economic conditions as "really, really severe poverty." When Prince was ten, his mother and the children fled by bus to Arizona. During his teenage years, Prince lived at various times with an adult male who provided drugs and alcohol in return for sex. At trial, the parties stipulated that this individual molested and sexually abused Prince.

¶111 Prince undoubtedly had a very difficult childhood. We consider it in mitigation but give it little weight because he has not established a connection between his childhood trauma and the murder. Moreover, Prince was twenty-six years old when he killed Cassandra, attenuating the impact of his dysfunctional childhood on his conduct. *See State v. McGill*, 213 Ariz. 147,

161 ¶ 63, 140 P.3d 930, 944 (2006).

¶112    Prince compares his case with *Bocharski*, in which we vacated a death sentence on independent review because of the defendant's abusive childhood, severe neglect, and alcoholism. 218 Ariz. at 497-99 ¶¶ 101-12, 189 P.3d at 424-26. In *Bocharski*, however, the defendant established a causal nexus between the crime and the mitigating evidence. *Id.* at 499 ¶ 110, 189 P.3d at 426 ("Dr. Beaver testified that Bocharski's troubled upbringing helped cause the murder of [the victim]: He testified that Bocharski's emotional and alcoholic state likely played a substantial role in the events that led to the murder . . . and that a person in his state would have been far less able than others to control and manage his feelings and reactions."). Here, in contrast, Prince did not prove a causal connection between his childhood and the crime.

## 3.    Poor Mental Health

¶113    Poor mental health that does not rise to the level of statutory mitigation under § 13-751(G)(1) may nonetheless be a non-statutory mitigating factor. *See Velazquez*, 216 Ariz. at 314 ¶ 65, 166 P.3d at 105. Absent a causal nexus to the crime, however, we usually give it little weight. *Armstrong*, 218 Ariz. at 465 ¶ 77, 189 P.3d at 392. We weigh mental health mitigation "in proportion to a defendant's ability to conform or appreciate the wrongfulness of his conduct." *State v. Boggs*, 218 Ariz.

54

325, 344 ¶ 94, 185 P.3d 111, 130 (2008) (quotation omitted).

¶114    Prince established that he suffers from mental illness.  Both mental health experts opined that Prince suffered from a mental disorder.  Prince's expert diagnosed him with borderline personality disorder.  The State's expert diagnosed Prince with anti-social personality disorder and agreed that Prince also exhibited some symptoms of borderline personality disorder.  Regardless of which specific diagnosis is correct, the record reflects that Prince's mental health is poor and, therefore, is a mitigating factor.

¶115    Prince claims a connection exists between his borderline personality disorder and the murder.  His expert testified that individuals with borderline personality disorders have "labile mood[s]" characterized by bouts of "intense and inappropriate anger," causing them to destroy relationships and act impulsively.  According to Prince, his violent upbringing exacerbated his disorder, making him unable to cope with the violent domestic dispute that resulted in Cassandra's death.

¶116    The expert, however, also testified that Prince knew right from wrong, and the State's expert testified that Prince had time to reflect and stop himself from committing the murder.  Neither expert could establish Prince's mental state on the night of the shootings.  And as stated earlier, neither expert testified that Prince was in a dissociative state, as Prince now

55

claims.

¶117     At most, Prince proved that he has a personality disorder, not that "the disorder controlled [his] conduct." *State v. Brewer*, 170 Ariz. 486, 505-06, 826 P.2d 783, 802-03 (1992) (concluding "[d]efendant's borderline personality disorder [did] not warrant a reduction of his sentence to life imprisonment"); *see State v. Stuard*, 176 Ariz. 589, 613, 863 P.2d 881, 905 (1993) ("Even if [the defendant] became enraged when confronted by his victims, he still displayed some ability to control his actions . . . . The doctors agree he appreciated the wrongfulness of his conduct and that he did not lose touch with reality."). Consequently, because Prince has failed to establish a causal nexus between his poor mental health and the murder, we give this factor little mitigating weight. *See Boggs*, 218 Ariz. at 344 ¶ 95, 185 P.3d at 130 (finding no causal link between mental health issues and crime when experts could not establish defendant's mental state or that defendant "did not know right from wrong"); *Pandeli*, 215 Ariz. at 533 ¶ 81, 161 P.3d at 576 (giving the defendant's "mental health mitigation minimal weight" when the evidence showed he "knew right from wrong, was not significantly impaired, and did not demonstrate a causal nexus between his mental impairments and the murder").

¶118     Prince also claims that his suicidal behavior on the night of the murder is a mitigating factor. Although suicidal

56

behavior is arguably subsumed within the statutory mitigating factor of significant impairment or the non-statutory factor of poor mental health, we give this factor its own mitigating weight. *See Williams v. Ryan*, 623 F.3d 1258, 1270 (9th Cir. 2010) ("[A] sentencing court must consider all mitigating evidence."). Although the testimony established that Prince exhibited suicidal tendencies, it also established that Prince knew it was wrong to shoot Cassandra, even if he was suicidal. As a result, Prince's suicidal behavior is entitled to little mitigating weight.

¶119    Finally, Prince claims as a mitigating factor his emotional and learning disabilities. These disabilities are a non-statutory mitigating factor but their lack of connection to the crime affects the weight we accord them. *See State v. Doerr*, 193 Ariz. 56, 71 ¶ 73, 969 P.2d 1168, 1183 (1998) (concluding no connection existed between the defendant's low IQ and the murder).

¶120    When Prince moved to Arizona, he was placed in classes for children with significant emotional disabilities. In high school, he attended classes for the learning disabled, but dropped out during the tenth grade. Prince has an IQ of 85 to 90, which his expert described as borderline mental retardation, but which the State's expert described as normal intelligence. Once again, however, Prince has not established any connection

57

between his disabilities and the crime, making them entitled to little mitigating weight.

**4.    Remorse**

¶**121**      A defendant's expression of remorse is a non-statutory mitigating factor.  *State v. Spreitz*, 190 Ariz. 129, 150, 945 P.2d 1260, 1281 (1997).  During his mental health evaluation, Prince said that he felt great remorse for Cassandra's death and that he would always regret killing her because she did not deserve to die.  Prince also gave a brief allocution in the penalty phase, stating he was "extremely sorry for the pain that [he] caused everyone."  Prince has thus established this mitigating factor, and it is entitled to some weight.

**C.    Propriety of Death Sentence**

¶**122**      In light of the relatively weak mitigation and the two aggravating factors, we conclude that Prince's mitigation is not sufficiently substantial to warrant leniency.

**IV.    CONCLUSION**

¶**123**      For the foregoing reasons, we affirm Prince's death sentence.[8]

_____
A. John Pelander, Justice

---

[8]    Prince raises twenty-two issues to avoid preclusion on federal review.  Those issues are presented verbatim in the Appendix.

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
W. Scott Bales, Justice


_____
Robert M. Brutinel, Justice


_____
Michael D. Ryan, Justice (Retired)[*]


**APPENDIX**

1.   The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Sections 1, 4, and 15 of the Arizona Constitution. *See State v. Cromwell*, 211 Ariz. 181, 192, 119 P.3d 449, 459 (2005).

2.   Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants whose victims have been Caucasian, in violation of the Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, and 13 of the Arizona Constitution. *See State v. West*, 176 Ariz. 432, 455, 862 P.2d 192, 215 (1993).

3.   The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.

---

[*]   Justice Andrew D. Hurwitz has recused himself from this case.   Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Michael D. Ryan, Retired, was designated to sit in this matter.

*See State v. Harrod*, 200 Ariz. 309, 26 P.3d 492 (2001).

4.   Execution by lethal injection is per se cruel and unusual punishment. *State v. Hinchey*, 161 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

5.   Arizona's death penalty statute unconstitutionally requires defendants to prove that their lives should be spared. *State v. Fulminante*, 161 Ariz. 237, 258, 779 P.2d 602, 623 (1988).

6.   Arizona's death penalty statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

7.   The statute unconstitutionally fails to require the cumulative consideration of multiple mitigating factors or require specific findings to be made as to each factor. *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995).

8.   The death penalty is unconstitutional because it permits jurors unfettered discretion to impose death without adequate guidelines. *State v. Johnson*, 212 Ariz. 425, 440, 133 P.3d 735, 750 (2006).

9.   The statute is unconstitutional because there are no statutory standards for weighing. *State v. Atwood*, 171 Ariz. 576, 645-46, 832 P.2d 593, 662-63 (1992).

10.  The statute insufficiently channels the sentencer's discretion in imposing the death sentence. *State v. Greenway*, 170 Ariz. 151, 164, 823 P.2d 22, 31 (1991).

11.  Appellant claims that a proportionality review of a defendant's death sentence is constitutionally required. *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995).

12.  Appellant claims that the State's failure to allege an element of a charged offense, the aggravating factors that made the defendant death eligible, is a fundamental defect that renders the

60

indictment constitutionally defective. *McKaney v. Foreman*, 209 Ariz. 268, 271, 100 P.3d 18, 21 (2004).

13. Appellant asserts that the application of the new death penalty statute passed in response to *Ring v. Arizona*, 536 U.S. 584 (2002), violates a defendant's right against ex post facto application of new laws. *State v. Ring*, 204 Ariz. 534, 547 ¶ 23, 65 P.3d 915, 928 (2003).

14. Appellant claims that execution by lethal injection is cruel and unusual punishment. *State v. Van Adams*, 194 Ariz. 408, 422, 984 P.2d 16, 30 (1999).

15. Subjecting Appellant to a new trial on the issues of aggravation and punishment before a new jury violated the double jeopardy clause of the Fifth Amendment. *State v. Ring*, 204 Ariz. 534, 547, 65 P.3d 915, 928 (2003).

16. Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

17. The absence of notice of aggravating factors prior to Appellant's guilt phase trial violates the Sixth, Eighth, and Fourteenth Amendments. *State v. Anderson*, [210] Ariz. 327, 347, 111 P.3d 369, 389 (2005).

18. The reasonable doubt instruction at the aggravation phase lowered the burden of proof and deprived Appellant of his right to a jury trial and due process []under the Sixth and Fourteenth Amendments. *State v. Dann*, 205 Ariz. 557, 575, 74 P.3d 231, 249 (2003).

19. Subjecting Appellant to a new trial on the issues of aggravation and punishment before a new jury violated the due process clause of the Fourteenth Amendment. *State v. Ellison*, 213 Ariz. 116, 137, 140 P.3d 899, 920 (2006).

20. Requiring the jury to unanimously determine whether the mitigating factors were sufficiently substantial to call for leniency violated the Eighth

61

Amendment. *State v. Ellison*, 213 Ariz. 116, 137, 140 P.3d 899, 920 (2006).

21. The trial court's refusal to admit stipulation that Appellant would waive parole violated his right to due process under the Fourteenth Amendment and his right to have jury consider all mitigation under the Eighth Amendment. *State v. Dann*, 220 Ariz. 351, 207 P.3d 604 (2009).

22. Arizona's death statute create an unconstitutional presumption of death and places an unconstitutional burden on Appellant to prove that mitigation is sufficiently substantial to call for leniency. *State v. Glassel*, 211 Ariz. 33, 52, 116 P.3d 1193, 1212 (2005).

62