IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee,*

*v.*

ABEL DANIEL HIDALGO,
*Appellant.*

No. CR-15-0049-AP
Filed March 15, 2017

Appeal from the Superior Court in Maricopa County
The Honorable Roland J. Steinle, III, Judge
No. CR2011-005473
**AFFIRMED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic Draye, Solicitor General, Lacey Stover Gard, Chief Counsel, Capital Litigation Section, Andrew S. Reilly (argued), Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Bruce F. Peterson, Maricopa County Office of the Legal Advocate, Consuelo M. Ohanesian (argued), Susan Corey (argued), Deputy Legal Advocates, Phoenix, Attorneys for Abel Daniel Hidalgo

CHIEF JUSTICE BALES authored the opinion of the Court, in which VICE CHIEF JUSTICE PELANDER and JUSTICES BRUTINEL, TIMMER, and BOLICK joined.

CHIEF JUSTICE BALES, opinion of the Court:

¶1 This automatic appeal concerns Abel Daniel Hidalgo's 2015 death sentences for murdering Michael Cordova and Jose Rojas. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and -4033(A).

**BACKGROUND**

¶2          In late December 2000, Hidalgo agreed to kill Michael Cordova in exchange for $1,000 from a gang member. He accepted the offer without knowing Cordova or why the gang wanted him murdered. One morning in January 2001, Hidalgo waited in his car near Cordova's auto-body shop. When Cordova began unlocking the shop, Hidalgo approached and feigned interest in some repair work. They were joined by Jose Rojas, who occasionally did upholstery work for Cordova and came that morning to retrieve some equipment. After the three men entered the shop, Hidalgo shot Rojas in the back of the head. Hidalgo then shot Cordova in the forehead. Even though the shots were fatal, Hidalgo shot each victim five more times to ensure he died.

¶3          After murdering Cordova and Rojas, Hidalgo went to the home of his godparents, Frank and Barbara Valenzuela. Barbara overheard Hidalgo tell others that he had just murdered two men and wanted to sell his car to Frank because a woman had seen him leave the shop. Frank purchased the car, and a few days later Hidalgo fled Arizona.

¶4          A year later, Barbara informed the Maricopa County Attorney's Office that Hidalgo murdered Cordova and Rojas. Phoenix Police subsequently interviewed Hidalgo in Idaho, where he had murdered two women in January 2002 and was under federal arrest. Hidalgo confessed to murdering Cordova for $1,000 and to killing Rojas to eliminate an eyewitness.

¶5          Hidalgo pleaded guilty in January 2015 to two counts of first degree murder and one count of first degree burglary. The jury found four aggravating circumstances with respect to the murder of Cordova and three with respect to the murder of Rojas: Hidalgo committed another offense eligible for a sentence of life imprisonment or death under Arizona law; Hidalgo committed prior serious offenses; Hidalgo murdered for pecuniary gain (only with respect to Cordova); and Hidalgo committed multiple homicides. A.R.S. §§ 13-751(F)(1), (F)(2), (F)(5), and (F)(8). Considering these factors and the mitigation evidence, the jury sentenced Hidalgo to death for each murder. The trial court also sentenced Hidalgo to 10.5 years' imprisonment for the burglary.

## DISCUSSION

### A. Facial Challenge to A.R.S. § 13-751

¶6 Before trial, Hidalgo filed a motion alleging that Arizona's death penalty statute is unconstitutional because the statutorily identified aggravating factors do not adequately narrow the class of those eligible for the death penalty and defendants are denied equal protection because poorer counties cannot afford to pursue death sentences. His motion was consolidated with similar motions filed by defendants in other cases. The defendants sought an evidentiary hearing to establish that every first degree murder case filed in Maricopa County in 2010 and 2011 could support at least one aggravating factor and that rural counties cannot afford to seek death sentences. The trial court denied the hearing request, ruling that even if the defendants' factual allegations are accepted as true, the constitutional claims fail as a matter of law.

¶7 On appeal, Hidalgo argues: (1) he was denied due process when the trial court refused to hold an evidentiary hearing; (2) A.R.S. § 13-751 fails to adequately narrow the class of those eligible for a death sentence; and (3) death sentences are arbitrarily imposed because poorer counties cannot afford to pursue the death penalty. This Court reviews a trial court's decision whether to hold an evidentiary hearing for abuse of discretion, *State v. Spears*, 184 Ariz. 277, 289, 908 P.2d 1062, 1074 (1996), and reviews "constitutional issues and purely legal issues de novo." *State v. Moody*, 208 Ariz. 424, 445 ¶ 62, 94 P.3d 1119, 1140 (2004).

### 1. The Refusal to Grant an Evidentiary Hearing

¶8 Hidalgo argues that he was entitled to an evidentiary hearing even though the trial court assumed his factual allegations were true in reviewing his constitutional claims. In various contexts, courts have recognized that evidentiary hearings are not required when courts need not resolve factual disputes to decide constitutional issues. *E.g.*, *State v. Gomez*, 231 Ariz. 219, 225–26 ¶ 29, 293 P.3d 495, 501–02 (2012) (finding that trial courts need not hold an evidentiary hearing on motion for new counsel where "there is no indication that a hearing would elicit additional facts beyond those already before the court"); *see also State v. Amaral*, 239 Ariz. 217, 219 ¶ 9, 220 ¶ 11, 368 P.3d 925, 927, 928 (2016) (noting that a post-conviction relief petitioner is entitled to a hearing "if he or she presents a

'colorable claim[,]'" i.e., if the petitioner "has alleged facts which, if true, would *probably* have changed the verdict or sentence").

**¶9**        Although Hidalgo correctly notes that capital defendants are accorded heightened procedural safeguards, *see, e.g.*, *Monge v. California*, 524 U.S. 721, 732–33 (1998), he has not identified any opinions holding that a capital defendant is entitled to an evidentiary hearing on a pretrial motion even if the court's ruling does not turn on disputed facts. Hidalgo also does not convincingly explain how the denial of an evidentiary hearing or the lack of findings of fact has hindered appellate review of his constitutional claims. Notably, he has not identified any particular evidence that he would have offered that would materially add to the factual record before the trial court or this Court on appeal.

**¶10**        Hidalgo also correctly notes that due process entitles parties to notice and a meaningful opportunity to be heard, citing *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), and *Mathews v. Eldridge*, 424 U.S. 319 (1976). But neither of these cases is apposite. *Mathews*, which concerned the denial of disability benefits, outlined a balancing test for identifying what process is due before persons may be deprived of liberty or property. 424 U.S. at 323, 334–35. *Hamdi* applied that test in holding that citizens detained by the military are entitled to a hearing to challenge their designation as enemy combatants. 542 U.S. at 529–35.

**¶11**        Citing *Hamdi* and *Fuentes v. Shevin*, 407 U.S. 67 (1972), Hidalgo also argues that a defendant is entitled to be heard even if the court believes his claim is invalid. *See Hamdi*, 542 U.S. at 530 ("'[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions.'") (quoting *Carey v. Piphus*, 435 U.S. 247, 266 (1978)); *Fuentes*, 407 U.S. at 87 ("The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing."). *Hamdi* and *Fuentes* each considered whether any hearing was required. *See Hamdi*, 542 U.S. at 509; *Fuentes*, 407 U.S. at 69–70. Hidalgo also argues that parties must be permitted to develop both the law and the facts, citing *Kessen v. Stewart*, 195 Ariz. 488, 492 ¶ 16, 990 P.2d 689, 693 (App. 1999). But "[p]rocedural due process . . . requires nothing more than an adequate opportunity to fully present factual and legal claims." *Id.* Hidalgo was afforded an adequate opportunity to be heard. Procedural due process does not require an evidentiary hearing on a motion when the legal claims do not turn on disputed facts.

**¶12**       Finally, citing *People v. Ballard*, 794 N.E.2d 788 (Ill. 2002), Hidalgo contends that whether a statute adequately narrows the class of those eligible for the death penalty is necessarily a factual question. *Ballard* rejected an argument that Illinois's capital sentencing scheme was unconstitutional because it had so many aggravating factors that it was "difficult to imagine a first degree murder defendant who does not qualify under at least one, if not several factors." *Id.* at 817. The majority in *Ballard* rejected the argument because: (1) the sentencing scheme narrowed the eligible defendants by means beyond the list of aggravating circumstances; and (2) it is impossible to identify how many aggravating circumstances would be too many for constitutional purposes. *Id.* at 819. The majority also observed that the defendant had not demonstrated that his claims were empirically accurate, *id.*, a point also noted by a concurring opinion, which stated, "whether the constitutional requirement of narrowing has occurred is a factual one." *Id.* at 826 (McMorrow, J., specially concurring). The concurrence did not suggest an evidentiary hearing is invariably required, but instead that the defendant's claims failed for lack of substantiation rather than as a matter of law. *Id.*

**¶13**       The trial court did not abuse its discretion here in denying an evidentiary hearing and instead assuming the truth of Hidalgo's factual assertions for purposes of ruling on the pending motion.

### 2. The Claim that A.R.S. § 13-751 Does Not Sufficiently Narrow the Class of Defendants Eligible for the Death Penalty

**¶14**       To be constitutionally sound, "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)). Hidalgo contends that A.R.S. § 13-751 does not satisfy this requirement.

**¶15**       We rejected a similar challenge in *State v. Greenway*, 170 Ariz. 155, 823 P.2d 22 (1991). Since *Greenway*, the legislature has expanded the list and the scope of individual aggravators. *Compare* A.R.S. § 13-703(F) (1989 & Supp. 1991) (enumerating ten aggravators), *with* A.R.S. § 13-751(F) (2010 & Supp. 2016) (enumerating fourteen aggravators). As a result,

Hidalgo argues, virtually every first degree murder case in Maricopa County has facts that could support at least one aggravator.

**¶16** In rejecting Hidalgo's argument, the trial court stated that it was bound by *Greenway* and *State v. Hausner*, 230 Ariz. 60, app. at 89, 280 P.3d 604, app. at 633 (2012) (noting similar argument in appendix listing claims defendant sought to preserve for federal review). The trial court acknowledged the legislature has expanded the scope of death penalty aggravators and the defendants offered to establish a precedential fact in Arizona - that the aggravators cover every first degree murder case filed within a broad period of time. Nonetheless, the court concluded that jury findings can supply the constitutionally required narrowing in a particular case.

**¶17** Hidalgo argues the legislature must statutorily narrow the scope of death-eligible murders. With the State's permission, he supplemented the record on appeal with an expanded study of first degree murder cases in several counties over an eleven-year period, which concludes that one or more aggravating circumstances were present in 856 of 866 murders.

**¶18** Hidalgo's argument finds some support from isolated quotes - as distinct from actual holdings - in opinions of the United States Supreme Court and our Court. Academic commentators have made similar arguments. *See, e.g.*, Chelsea Sharon, Note, *The "Most Deserving" of Death: The Narrowing Requirement and the Proliferation of Aggravating Factors in Capital Sentencing*, 46 Harv. C.R.-C.L. L. Rev. 223, 244–50 (2011). Nonetheless, "[d]espite the constitutional concerns these expansive statutes [identifying aggravating factors] raise, the vast majority of courts have rejected narrowing challenges to such statutes." *Id.* at 238; *see also Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (rejecting as "entirely otiose" the claim that Arizona's statute is unconstitutional because it "does not properly narrow the class of death penalty recipients"); *State v. Steckel*, 711 A.2d 5, 12–13 (Del. 1998); *State v. Wagner*, 752 P.2d 1136, 1158 (Or. 1988).

**¶19** Although the United States Supreme Court has not directly addressed whether a death penalty statute may fail to provide sufficient narrowing by including too many aggravating circumstances, its case law undermines Hidalgo's position. The narrowing requirement is rooted in *Furman v. Georgia*, which struck down death penalty statutes that gave

juries unguided discretion to impose death sentences for various types of murder and other crimes and resulted in "this unique penalty" being "wantonly and so freakishly imposed." 408 U.S. 238, 310 (1972) (Stewart, J., concurring).

¶20　　　　After *Furman*, many states enacted new capital statutes. In upholding several such statutes, the Court in *Gregg v. Georgia* noted that "[t]he basic concern of *Furman* centered on those defendants who were being condemned to death capriciously and arbitrarily." 428 U.S. 153, 206 (1976) (opinion of Stewart, J.). *Gregg* held that a death sentence may not be imposed unless the sentencing authority finds and identifies "at least one statutory aggravating factor[.]" *Id.* The concerns underlying *Furman* were obviated by the procedures reviewed in *Gregg* because the sentencing procedures focused the jury's attention "on the particularized nature of the crime and the particularized characteristics of the individual defendant" and permitted the jury to consider any aggravating or mitigating circumstances before it could impose a sentence of death, and death sentences were subject to appellate review. *Id.* at 206-07.

¶21　　　　More recently, the United States Supreme Court has identified "two different aspects of the capital decision-making process: the eligibility decision and the selection decision." *Tuilaepa v. California*, 512 U.S. 967, 971 (1994). With regard to eligibility, "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield*, 484 U.S. at 244 (quoting *Zant*, 462 U.S. at 877). The selection decision requires an individualized determination based on the character of the individual and the circumstances of the crime. *Zant*, 462 U.S. at 879. Accordingly, a statute that "provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage" will ordinarily satisfy Eighth Amendment and due process concerns, *id.*, so long as the state ensures "that the process is neutral and principled so as to guard against bias or caprice[.]" *Tuilaepa*, 512 U.S. at 973.

¶22　　　　"To render a defendant eligible for the death penalty in a homicide case . . . the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Id.* at 971-72. "[T]he aggravating circumstance must meet two requirements. First, the circumstance . . . must apply only to a subclass

7

of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague." *Id.* at 972 (internal citations omitted).

¶23 Discussions of "narrowing" challenges to death penalty statutes may involve two different questions: (1) whether a particular aggravator applies to fewer than all murders; and (2) whether the scheme overall "is neutral and principled so as to guard against bias or caprice[.]" *Id.* at 972–73.

¶24 Hidalgo does not contend that any of Arizona's statutorily defined aggravators are insufficiently narrow in the first sense. *Cf. Godfrey v. Georgia*, 446 U.S. 420, 433 (1980) (reversing death sentence where aggravating circumstance could apply to any murder). An aggravating circumstance satisfies this narrowing requirement so long as it applies only to a subclass of murders. *See Tuilaepa*, 512 U.S. at 972; *Arave v. Creech*, 507 U.S. 463, 474 (1993); *Hausner*, 230 Ariz. at 82 ¶ 99, 280 P.3d at 626. Hidalgo also has not alleged that any of the statutory aggravators are vague or that the aggravators applied in his case were not supported by sufficient evidence or failed to distinguish his murders from murders in general.

¶25 Hidalgo argues that Arizona's capital scheme is unconstitutional because it provides no narrowing - virtually every first degree murder case presents facts that could support at least one aggravating circumstance. He acknowledges that prosecutors sought the death penalty in Maricopa County in about ten percent of first degree murder cases in 2010 and 2011. But he contends that this situation is impermissibly "arbitrary" and violates the Eighth Amendment and due process because there is no principled basis for identifying which capital defendants will be subject to the death penalty.

¶26 In requiring "narrowing" in the eligibility phase of capital proceedings, the United States Supreme Court has focused on whether the sentencer is required to find an aggravating fact beyond the murder itself. *Arave*, 507 U.S. at 470 (stating that a capital sentencing scheme must "suitably direc[t] and limi[t] the *sentencer's discretion* so as to minimize the risk of wholly arbitrary and capricious action") (internal quotation marks omitted) (emphasis added). The Court has not looked beyond the particular case to consider whether, in aggregate, the statutory scheme limits death-sentence eligibility to a small percentage of first degree

murders. Even if Hidalgo is right in his factual assertion that nearly every charged first degree murder could support at least one aggravating circumstance, no defendant will be subject to a death sentence merely by virtue of being found guilty of first degree murder and, as Hidalgo acknowledges, death sentences are in fact not sought in most first degree murder cases. Observing that at least one of several aggravating circumstances could apply to nearly every murder is not the same as saying that a particular aggravating circumstance is present in every murder. *Cf.* Carol S. Steiker & Jordan M. Steiker, Courting Death: The Supreme Court and Capital Punishment 160 (2016) (noting that the Court assesses "whether *individual* aggravators" rather than "aggravating factors *taken collectively*" narrow the class of offenders eligible for the death penalty) (emphasis in original).

¶27 As Hidalgo notes, our Court has "repeatedly held" that "the death penalty should not be imposed in every capital murder case but, rather, it should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime 'above the norm of first-degree murders.'" *State v. Carlson*, 202 Ariz. 570, 582 ¶ 45, 48 P.3d 1180, 1192 (2002) (quoting *State v. Hoskins*, 199 Ariz. 127, 163 ¶ 169, 14 P.3d 997, 1033 (2000)). "The specified statutory aggravators in Arizona's death penalty scheme are designed to narrow, in a constitutional manner, the class of first degree murderers who are death-eligible." *State v. Soto-Fong*, 187 Ariz. 186, 202, 928 P.2d 610, 626 (1996).

¶28 Hidalgo is mistaken, however, insofar as he focuses only on the legislatively defined aggravating circumstances in arguing that Arizona's scheme does not constitutionally narrow the class of those eligible for death sentences. "The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion." *Lowenfield*, 484 U.S. at 244 (holding that narrowing function may be performed by jury findings at guilt or sentencing phase). The legislature's definition of aggravating factors is not the only way in which Arizona's sentencing scheme narrows the class of persons eligible for death. *See State v. Bible*, 175 Ariz. 549, 603–04, 858 P.2d 1152, 1206–07 (1993). Arizona statutorily limits the death penalty to a subclass of defendants convicted of first degree murder. *Greenway*, 170 Ariz. at 164, 823 P.2d at 31. Arizona's statutes further limit death eligibility to the identified aggravating circumstances (which, as noted above, Hidalgo does not challenge individually as either

overly broad or vague). Additionally, a defendant in a particular case only becomes death-eligible if the state proves beyond a reasonable doubt that one or more of the alleged aggravating circumstances exists. A.R.S. § 13-751(B); *Greenway*, 170 Ariz. at 164, 823 P.2d at 31. Arizona's statutory scheme further provides for individualized sentencing determinations that consider any mitigating circumstances along with the defendant's culpability, and for mandatory appellate review. *See* A.R.S. § 13-751(C), (E); *Greenway*, 170 Ariz. at 164, 823 P.2d at 31. This statutory framework seeks to "ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa*, 512 U.S. at 973.

**¶29** Finally, Hidalgo cannot successfully argue that Arizona's capital sentencing scheme is "arbitrary" and violates the Eighth Amendment or due process because it leaves the decision whether to seek death to the discretion of prosecutors. The United States Supreme Court has rejected similar arguments in *McCleskey v. Kemp*, 481 U.S. 279, 311–12 (1987), and *Gregg*, 428 U.S. at 199, where the Court observed that discretionary removal of defendants as candidates for death does not render a death sentence imposed in a particular case arbitrary and capricious. *See also State v. Ovante*, 231 Ariz. 180, 185–86 ¶¶ 18–22, 291 P.3d 974, 979–80 (2013) (rejecting argument that "unbridled charging discretion" of prosecutors violates due process, equal protection, and the Eighth Amendment).

### 3. The Equal Protection Challenges

**¶30** Before the trial court, Hidalgo argued that A.R.S. § 13-751 is not applied equally across the state because poor counties cannot afford to seek the death penalty and the statute therefore violates the Equal Protection Clause or the Arizona constitutional provisions regarding equal privileges or immunities, Ariz. Const. art. 2, § 13, or barring the enactment of local or special laws. Ariz. Const. art. 4, part 2, § 19(7). In rejecting these arguments, the trial court noted that an equal protection claim could not succeed absent purposeful discrimination, which the defendants had not alleged. *See McCleskey*, 481 U.S. at 292; *Ovante*, 231 Ariz. at 186 ¶ 21, 291 P.3d at 980 (holding that showing defendants in Maricopa County are more likely to receive the death penalty than defendants in other counties does not establish an Equal Protection Clause violation).

**¶31**      On appeal, Hidalgo disclaims relying on the Equal Protection Clause, but instead argues that the inter-county disparity violates the "equal protection component implicit in the Eighth Amendment," which does not require a showing of purposeful discrimination. He again argues that A.R.S. § 13-751 violates Arizona's Equal Privileges and Immunities Clause and prohibition on special laws. Without developing his arguments, he also asserts that the capital sentencing scheme violates the provisions in article 2, sections 4 and 15 of Arizona's Constitution, requiring due process and barring cruel and unusual punishment.

**¶32**      We reject Hidalgo's arguments. Insofar as Hidalgo contends that discretionary decisions by prosecutors not to seek the death penalty create inter-county disparities and thereby violate the Eighth Amendment, his argument is foreclosed by *McCleskey* and *Ovante*. The United States Court of Appeals for the Fifth Circuit has rejected a similar claim that a death penalty statute violated the Eighth Amendment because certain counties disproportionately applied the death penalty. *Allen v. Stephens*, 805 F.3d 617, 629–30 (5th Cir. 2015) ("[N]o Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions. . . . [T]he Supreme Court has specifically acknowledged that differing law enforcement resources and prosecutorial discretion make uniform application of the death penalty impossible."), *cert. denied*, 136 S. Ct. 2382 (2016).

**¶33**      Hidalgo's assertion that the death penalty violates Arizona's Equal Privileges and Immunities Clause also fails because he has not alleged purposeful discrimination. *Cf. Ovante*, 231 Ariz. at 186 ¶ 21, 291 P.3d at 980 (rejecting equal protection claim on same grounds). Nor can he succeed on his assertion that § 13-751 is an impermissible "local or special law" in violation of article 4, part 2, section 19(7). The statute is a general law as it applies to all death penalty cases statewide. *See Eastin v. Broomfield*, 116 Ariz. 576, 584, 570 P.2d 744, 752 (1977).

**¶34**      The Court need not address Hidalgo's undeveloped arguments that § 13-751 violates the due process or the cruel and unusual punishment provisions in article 2, sections 4 and 15. *See Ovante*, 231 Ariz. at 185 ¶ 18 n.1, 291 P.3d at 979 (noting the Court will not consider or address unsupported constitutional claims). Moreover, the Court has previously rejected arguments that the death penalty is imposed arbitrarily and irrationally in Arizona in violation of article 2, section 4, *see, e.g.*, *State v.*

*Smith*, 203 Ariz. 75, 82 ¶ 36, 50 P.3d 825, 832 (2002), and Hidalgo has not explained how Arizona's prohibition on cruel and usual punishment should afford any protections different than the Eighth Amendment in this context.

## B. Prosecutorial Statements Diminishing Jury's Responsibility

¶35 During closing argument at the penalty phase, the prosecutor told the jurors, "[i]f you unanimously agree that there is no mitigation, or the mitigation is not sufficiently substantial to call for leniency, then you shall return a verdict of death. It's not an option." Hidalgo contends that such remarks diminished the jury's sense of responsibility for its verdict and violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and article 2, sections 4 and 15 of the Arizona Constitution.

¶36 Because Hidalgo did not object to the prosecutor's statements, we review for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005). To establish fundamental error, Hidalgo must show he was prejudiced by an error that went to the foundation of his case and denied him a fair trial. *Id*. at 568 ¶¶ 23–24, 569 ¶ 26, 115 P.3d at 608–09. When determining whether error is fundamental, this Court reviews the entire record and the totality of the circumstances. *State v. Hughes*, 193 Ariz. 72, 86 ¶ 62, 969 P.2d 1184, 1198 (1998).

¶37 Hidalgo argues that the prosecutor's statements diminished the jury's sense of responsibility for its verdict in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985). We reject this argument because: (1) the prosecutor's statements accurately stated the law; (2) *Caldwell* does not apply; and (3) Hidalgo cannot show prejudice because the jurors are presumed to have followed the trial court's instructions about their role in sentencing.

¶38 The prosecutor's statements mirror Arizona law, which provides that "[t]he trier of fact shall impose a sentence of death if the trier of fact finds one or more . . . aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency." A.R.S. § 13-751(E). This Court has held that jury instructions restating this language do not violate the Eighth Amendment by creating a "presumption of death," so long as the jury is

allowed to consider any relevant mitigating evidence. *See, e.g., State v. Harrod*, 218 Ariz. 268, 281 ¶ 49, 183 P.3d 519, 532 (2008). The trial court's instructions comported with Arizona's statute and our case law, and Hidalgo does not challenge the trial court's instructions on appeal.

¶39 Hidalgo instead argues that the prosecutor's statements violated *Caldwell* by diminishing the jury's sense of responsibility for its verdict. Stating that the "law" may require a death sentence in certain circumstances, Hidalgo contends, may confuse the jury and prevent it from recognizing that jurors must individually make a moral determination, which can be grounded on mercy, as to the appropriate sentence. In *Caldwell*, the Court reversed a death sentence imposed after a prosecutor incorrectly suggested to the jury that "the responsibility for the ultimate determination of death will rest with others" thereby presenting "an intolerable danger that the jury will in fact choose to minimize the importance of its role." 472 U.S. at 333. Hidalgo states that "[t]he rationale underlying *Caldwell* applies equally well to these facts."

¶40 "*Caldwell*, however, merely held that a death sentence could not stand 'when the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case.'" *State v. Anderson*, 210 Ariz. 327, 337 ¶ 22, 111 P.3d 369, 379 (2005) (quoting *Caldwell*, 472 U.S. at 323) (emphasis removed); *see also Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (noting *Caldwell* applies only to statements that mislead the jury into feeling less responsible than it should for the sentencing decision).

¶41 The prosecutor's statements did not violate *Caldwell* by suggesting that ultimate responsibility for imposing a death sentence rested with others. To the contrary, the prosecutor noted the jury's responsibility by stating "each of you must decide the case for yourself[.]" Defense counsel also noted the jury's responsibility in various ways, including by stating "you are the sole judges of the sentence in this case." The jury instructions also thoroughly discussed the jury's responsibility in determining the death sentence and noted: "Your decision is not a recommendation. Your decision is binding."

¶42 Hidalgo also speculates that the prosecutor's comments may have caused jurors to think they could not consider "mercy" in making the sentencing decision. The jury instructions, however, explained that

mitigating circumstances "are not an excuse or justification for the offense but are factors that in fairness or mercy may reduce the defendant's moral culpability." Both the prosecutor and defense counsel referenced this statement in their closing arguments.

**¶43** Because the prosecutor's statements accurately reflected the law, and did not violate *Caldwell* when considered in light of the record, they do not constitute error, much less fundamental error. *See State v. Benson*, 232 Ariz. 452, 463 ¶ 44, 307 P.3d 19, 30 (2013) (finding no error in trial court's overruling objection to prosecutor's closing argument that accurately stated the law). In any event, Hidalgo could not establish prejudice because the jury instructions accurately described the jury's role in sentencing, and the jury is presumed to have followed them. *See, e.g., State v. Newell*, 212 Ariz. 389, 403 ¶ 68, 132 P.3d 833, 847 (2006); *see also Anderson*, 210 Ariz. at 342 ¶ 50, 111 P.3d at 384 (noting that a misstatement of the law can be cured by court's instruction that attorney arguments are not evidence).

## C. Revocation of Self-Representation

**¶44** Hidalgo contends the trial court abused its discretion when it revoked his self-representation after Hidalgo refused to proceed with jury selection on the long-scheduled trial date. "A trial court's decision to revoke a defendant's self-representation is reviewed for an abuse of discretion." *Gomez*, 231 Ariz. at 222 ¶ 8, 293 P.3d at 498 (2012). Self-representation may be revoked if a defendant fails to comply with court rules or orders. *Id.* at 223 ¶ 15, 293 P.3d at 499.

**¶45** Hidalgo contends that he was unable to proceed because a disability limits his ability to write by hand and the trial court improperly denied him access to a typewriter for use in preparing for trial. The record does not show that Hidalgo's physical condition prevented him from preparing for trial or that the trial court erred in denying his request to be allowed to use a typewriter in his cell. Instead, the trial court acted within its discretion by revoking Hidalgo's self-representation when, contrary to the court's repeated warnings and orders, Hidalgo was unwilling to proceed on the scheduled trial date.

**¶46** After Hidalgo was indicted in 2011, he was represented by appointed counsel for several years. In August 2014, the trial court granted

a final motion to continue and set a firm trial date for December 8, 2014. At a September 2014 hearing, Hidalgo asked to represent himself because he disagreed with his counsel's refusal to list and interview certain witnesses. The trial court discussed with Hidalgo the disadvantages of proceeding pro per and reminded him of the trial date and his responsibility to follow the rules. The court then granted Hidalgo's request to proceed pro per and appointed his counsel as advisory counsel.

¶47 At the end of the hearing, Hidalgo filed a handwritten motion to obtain and use a laptop computer in his cell. In the motion, Hidalgo stated that he suffered from "trigger finger," an arthritic complication that causes his fingers to lock up if held in one place too long. After a hearing on October 17, at which no representative appeared for the Maricopa County Sheriff's Office ("MCSO"), the trial court granted Hidalgo's motion with the understanding that it would permit a laptop or "other authorized word processing instrument," but noted that the MCSO would let the court know "if that violates the rules."

¶48 On October 30, MCSO filed a motion for reconsideration asking the trial court to vacate its order and instead deny Hidalgo's request. MCSO said its policy prohibited providing inmates access to such devices because of security risks and noted that Hidalgo had twenty-seven disciplinary violations, including threatening and assaulting staff. MCSO also observed that Hidalgo's advisory counsel could provide Hidalgo access to a laptop during legal visits to prepare any documents.

¶49 On November 19, the court heard argument on MCSO's motion. By this time, the case had been assigned to a different judge for trial. The court granted MCSO's motion to vacate the order allowing Hidalgo access to an "authorized word processing instrument." Reminding Hidalgo he had to follow the rules, the trial court also said it could revoke his self-representation if he was not prepared to go forward with trial on December 8.

¶50 Hidalgo also filed a motion on November 19 to continue the trial, asserting that he was having trouble contacting witnesses and it was taking him longer to prepare without a typewriter. On December 1, the trial court denied this motion and again reminded Hidalgo that he was required to follow the rules. On December 3, the court held another hearing

and reaffirmed that trial would begin on December 8.  When Hidalgo said he could not prepare for trial without a typewriter, the judge responded:

> [I]f you're not going to follow the rules, and you're going to tell me you can't proceed on Monday the 8th because you're physically incapable of doing it, then we'll have the hearing that's set forth under State vs. Gomez, and I'll make a finding that you're not capable of doing it, withdraw your pro per status, and your advisory counsel will become assigned counsel again, and we will proceed on the 8th with jury selection.

**¶51**		On the morning of December 8, Hidalgo told the trial court that he was asking for reconsideration of his request for a typewriter because he could not prepare for trial without one and inmates who had been helping him file handwritten motions were no longer available. Hidalgo also asked the trial court to continue the trial until March 2015 because he was not prepared to proceed.

**¶52**		The trial court denied Hidalgo's motions, noting that a continuance would be futile because Hidalgo claimed he was physically incapable of preparing for trial without a typewriter and the judge was not going to provide him one.  The court reminded Hidalgo that he had been granted pro per status on the understanding that he would be prepared for trial on the scheduled date.  After Hidalgo reaffirmed he was not prepared to proceed, the trial court stated, "in light of your refusal to proceed with this matter, the court has no option but to withdraw your pro per status[.]" The court then reassigned Hidalgo's advisory counsel as his appointed counsel and began jury selection.

**¶53**		On appeal, Hidalgo argues that the trial court abused its discretion in revoking his self-representation because the trial court made it impossible for him to abide by the court's orders by not granting him access to a typewriter.  He distinguishes *Gomez*, in which this Court upheld the revocation of self-representation, because the defendant there had attempted to manipulate the court, engaged in willful violations of the rules, and continuously interrupted or delayed court proceedings.

**¶54**		Contrary to Hidalgo's arguments, the trial court did not abuse its discretion in revoking his pro per status.  *Gomez* recognizes that self-

representation may be revoked if a defendant fails to follow court orders. 231 Ariz. at 223 ¶ 15, 293 P.3d at 499. The trial court repeatedly ordered Hidalgo to be ready to proceed with trial on December 8 and, when that day arrived, Hidalgo informed the court that he could not proceed. The trial court thus properly revoked Hidalgo's pro per status based on his refusal to proceed on the scheduled trial date.

¶55 Although Hidalgo asserts he could not prepare for trial without a typewriter, his inability to access a typewriter in his cell did not prevent him from preparing his case to begin trial on December 8. Hidalgo began representing himself on September 30 only after he had been represented by counsel for several years and a firm trial date had been set. He continued to have advisory counsel, and during his period of self-representation, he filed thirty-one handwritten motions. Although Hidalgo told the trial court that he had been unable to file an interlocutory appeal from the trial court's denying him access to a typewriter, Hidalgo did not identify to the trial court or to this Court how denying him access to a typewriter prevented his filing any particular motion in the trial court or otherwise preparing for trial.

¶56 We emphasize two points regarding our ruling that the trial court did not abuse its discretion in revoking Hidalgo's self-representation. As the State conceded at oral argument, it would have been improper for the trial court to revoke Hidalgo's pro per status because Hidalgo had a physical disability or because the trial court thought he was not appropriately preparing his case. The right to self-representation respects the defendant's right to choose how to conduct his defense, *see Faretta v. California*, 422 U.S. 806, 834 (1975), and a trial court cannot revoke self-representation merely because it thinks a defendant is failing to prepare for trial. *See United States v. Flewitt*, 874 F.2d 669, 676 (9th Cir. 1989) (holding that district court erred in revoking self-representation based on the defendants' failure to "engage in meaningful discovery, . . . to make use of the resources available to them, and their general failure to prepare for trial[.]"). There is a difference, however, between revoking self-representation because a defendant is not willing to proceed on the scheduled trial date, which is permissible, and revoking self-representation because a court believes a defendant is not properly preparing for trial, which generally is not. In the latter situation, the defendant will bear the consequences of his lack of preparation; in the former, the defendant's

refusal to proceed disrupts the proceedings altogether, justifying the revocation of self-representation.

¶57 It is likewise improper to revoke a defendant's self-representation based merely on a physical disability. This Court has indicated that a defendant's physical ability to conduct a defense is generally irrelevant to determining whether a defendant is entitled to self-representation. *See State v. Doss*, 116 Ariz. 156, 160, 568 P.2d 1054, 1058 (1977) ("There was evidence that the defendant was physically unable to carry on his defense, and at various times the defendant has acknowledged that stress affects his speech and presents a danger of seizure. *Faretta*, however, makes clear that the lack of skill and experience is not the issue in making the choice of self-representation.") (footnote omitted). Accordingly, a defendant's disability can provide grounds for denying or revoking self-representation only if it renders a defendant physically incapable of presenting a case to the jury and abiding by court rules and protocol. *Cf. Savage v. Estelle*, 924 F.2d 1459, 1464, 1466 (9th Cir. 1990) (upholding revocation of self-representation in "rare case[s]," such as here, where severe speech impediment prevented defendant from "abid[ing] by [the] rules of procedure and courtroom protocol" but distinguishing a denial of a right "to communicate to the jury with the assistance of a sign language interpreter, or some other mechanical or non-mechanical means of rapid communication").

¶58 The record does not reflect that the trial court revoked Hidalgo's self-representation because of a physical disability or his failing to prepare for trial. Instead, as the trial court expressly stated, it revoked self-representation because Hidalgo refused to follow court orders to proceed with trial on the scheduled date.

### D. Failure to Hold Evidentiary Hearing on Motion for New Counsel

¶59 Hidalgo argues that the trial court erred on December 8 in denying his request for new counsel without holding an evidentiary hearing. We review that decision for an abuse of discretion. *Gomez*, 231 Ariz. at 226 ¶ 29, 293 P.3d at 502. An evidentiary hearing on a motion for change of counsel is not required "if the motion fails to allege specific facts suggesting an irreconcilable conflict or a complete breakdown in communication, or if there is no indication that a hearing would elicit additional facts beyond those already before the court." *Id.* at 225–26 ¶ 29,

293 P.3d at 501–02. The defendant bears the burden of making sufficient factual allegations in support of his request for an evidentiary hearing. *State v. Torres*, 208 Ariz. 340, 343 ¶ 8, 93 P.3d 1056, 1059 (2004).

¶60 When Hidalgo requested a change of counsel, he informed the trial court he had been unable to get along with his appointed lawyers and could not "come to an agreement on this trial on my defense, mitigation, and everything else that comes with the trial." He said he and his lawyers had not seen "eye to eye for some time," and they had been ineffective in preparing his case. Hidalgo then asked for an evidentiary hearing on his motion, but the trial court denied it.

¶61 Hidalgo failed to identify specific facts sufficient to require an evidentiary hearing. His statement that he disagreed with his lawyers on "[his] defense, mitigation, and everything else that comes with trial" reflects disagreements over trial strategy, and such disagreements do not constitute an irreconcilable conflict. *See State v. Cromwell*, 211 Ariz. 181, 186 ¶ 29, 119 P.3d 448, 453 (2005). Although Hidalgo said his lawyers had been ineffective in preparing his case, "generalized complaints" about differences in strategy do not necessitate a hearing. *See Torres*, 208 Ariz. at 343 ¶ 8, 93 P.3d at 1059. When Hidalgo earlier elected to represent himself, his request likewise reflected disagreement over trial strategy - namely, disagreement over his appointed counsel's refusal to list and interview certain witnesses - rather than specific allegations of irreconcilable differences or a complete breakdown in communication. The trial court therefore did not abuse its discretion when it denied Hidalgo's request for change of counsel without holding an evidentiary hearing.

### E. Independent Review of Death Sentence

¶62 Because Hidalgo committed the murders before August 1, 2002, we independently review his death sentence. *See* A.R.S. § 13-755(A).

### 1. Aggravating Circumstances

¶63 The jury found four aggravators - (F)(1) (conviction of another offense for which life or death sentence imposable), (F)(2) (prior conviction of a serious offense), (F)(5) (pecuniary gain), and (F)(8) (multiple murders during commission of offense) - with respect to the murder of Michael Cordova and three aggravators - (F)(1), (F)(2), and (F)(8) - with respect to

the murder of Jose Rojas. Hidalgo does not contest the sufficiency of the evidence, and our review of the record confirms that the State proved each aggravator beyond a reasonable doubt.

¶64 Hidalgo's federal convictions for murdering two women in 2002 were each punishable by a sentence of life imprisonment or death, and thus, either conviction establishes the (F)(1) aggravator. The State proved the (F)(5) aggravator because Hidalgo confessed to murdering Cordova for $1,000. Hidalgo also pleaded guilty to murdering Cordova and Rojas within minutes of one another inside Cordova's auto-body shop. While stating that he murdered Cordova because a gang member had hired him to do so, he confessed to killing Rojas simply to eliminate a witness to Cordova's murder. Hidalgo's confession consequently established that Cordova and Rojas's murders were temporally, spatially, and motivationally related as required for the (F)(8) aggravator. *See State v. Djerf*, 191 Ariz. 583, 597 ¶ 57, 959 P.2d 1274, 1288 (1998).

¶65 The State, however, erred when proving the (F)(2) aggravator, which turns on Hidalgo's having been "previously convicted of a serious offense, whether preparatory or completed." When Hidalgo murdered Cordova and Rojas in 2001, this aggravator could not be established based on offenses concurrently committed or charged. *See* A.R.S. § 13-703(F)(2) (1989 & Supp. 2000). In 2003, the legislature amended the statute to include serious offenses concurrently committed or charged. *See* A.R.S. § 13-751(F)(2). Because the earlier version of the statute applied, the State (as it acknowledges on appeal) erred in arguing during the aggravation phase that Hidalgo's conviction for the first degree burglary committed concurrently with the murders supported the (F)(2) aggravator. *See State v. Rutledge*, 206 Ariz. 172, 178 ¶ 25, 76 P.3d 443, 449 (2003).

¶66 Hidalgo did not object, however, and this error was not fundamental as he was not prejudiced. First degree murder is also a serious offense supporting the (F)(2) aggravator. A.R.S. § 13-703(H)(1)(a) (1989 & Supp. 2000). Hidalgo pleaded guilty to two counts of first degree murder in 2002. While one such conviction satisfies the (F)(1) aggravator, the second establishes the (F)(2) aggravator. Thus, the record independently supports the finding of the (F)(2) aggravator beyond a reasonable doubt.

## 2. Mitigating Circumstances

**¶67** At the sentencing phase, Hidalgo presented several witnesses who explored his difficult and abusive childhood, which included physical and sexual abuse by his parents and extended family, gang affiliation, poverty, juvenile incarceration, and drug use. Hidalgo's chief mitigation witness, Dr. Clark, testified that Hidalgo likely had attention deficit hyperactivity disorder ("ADHD"), conduct disorder, post-traumatic stress disorder ("PTSD"), and antisocial personality disorder ("APD"). Another mitigation expert described the gang family and culture Hidalgo was born into and the difficulties with renouncing one's gang affiliation. Hidalgo also presented evidence that while in prison he renounced his gang affiliation and participated in educational and self-improvement programs. During allocution, Hidalgo expressed remorse and a desire to be rehabilitated.

**¶68** Hidalgo had a cruel and traumatic childhood. Dr. Clark observed that Hidalgo's upbringing and mental disorders "constrained" his ability to make choices. Dr. Clark's diagnosis of PTSD, however, was based primarily on Hidalgo's self-reporting, and an expert witness for the State concluded Hidalgo's symptoms were contrived and inconsistent with PTSD. Hidalgo understood the wrongfulness of his actions, and no mitigation witness convincingly explained how his childhood or mental conditions led him, at age 23, to murder Cordova and Rojas. Although we consider all mitigating circumstances, we view them as less compelling because Hidalgo has not shown their causal connection to the murders. *State v. Prince*, 226 Ariz. 516, 541 ¶ 109, 542 ¶ 113, 250 P.3d 1145, 1170–71 (2011).

## 3. Propriety of Death Sentence

**¶69** We consider the quality and the strength, not simply the number, of aggravating and mitigating factors. *State v. Greene*, 192 Ariz. 431, 443 ¶ 60, 967 P.2d 106, 118 (1998). When independently reviewing a death sentence, we have given "extraordinary weight" to the multiple murders aggravating circumstance and found the pecuniary gain aggravator "especially strong" in the case of a contract killing. *State v. Moore*, 222 Ariz. 1, 23 ¶ 137, 213 P.3d 150, 172 (2009); *Harrod*, 218 Ariz. at 284 ¶ 63, 183 P.3d at 535. Here, Hidalgo admitted killing one man for $1,000 and another simply to eliminate an eyewitness. In light of the aggravating

factors, we conclude that "the mitigation is not sufficiently substantial to warrant leniency[.]" A.R.S. § 13-755(B).

### F. Additional Issues

¶70 Stating that he seeks to preserve certain issues for federal review, Hidalgo lists twelve additional constitutional claims that have been rejected in previous decisions. We decline to revisit these claims.

### CONCLUSION

¶71 We affirm Hidalgo's convictions and sentences.