# SUPREME COURT OF THE UNITED STATES

## ABEL DANIEL HIDALGO *v.* ARIZONA

ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME
COURT OF ARIZONA

No. 17–251.   Decided March 19, 2018

The petition for a writ of certiorari is denied.

Statement of JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, respecting the denial of certiorari.

The petition in this capital case asks an important Eighth Amendment question:

> "Whether Arizona's capital sentencing scheme, which includes so many aggravating circumstances that virtually every defendant convicted of first-degree murder is eligible for death, violates the Eighth Amendment." Pet. for Cert. (i).

## I

"Our capital punishment cases under the Eighth Amendment address two different aspects of the capital decisionmaking process: the eligibility decision and the selection decision." *Tuilaepa* v. *California*, 512 U. S. 967, 971 (1994). States must comply with requirements for each decision. See *Kansas* v. *Marsh*, 548 U. S. 163, 173–174 (2006) ("Together, our decisions in *Furman* v. *Georgia*, 408 U. S. 238 (1972) (*per curiam*), and *Gregg* v. *Georgia*, 428 U. S. 153 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), establish that a state capital sentencing scheme must" comport with requirements for each decision).

In respect to the first, the "eligibility decision," our precedent imposes what is commonly known as the "narrowing" requirement. "To pass constitutional muster, a

capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield* v. *Phelps*, 484 U. S. 231, 244 (1988) (quoting *Zant* v. *Stephens*, 462 U. S. 862, 877 (1983)). To satisfy the "narrowing requirement," a state *legislature* must adopt "*statutory factors* which determine death eligibility" and thereby "limit the class of murderers to which the death penalty may be applied." *Brown* v. *Sanders*, 546 U. S. 212, 216, and n. 2 (2006) (emphasis added); see also *Tuilaepa*, *supra*, at 979 ("'Once the jury finds that the defendant falls within the *legislatively* defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment'" (quoting *California* v. *Ramos*, 463 U. S. 992, 1008 (1983); emphasis added)); *Lowenfield*, *supra*, at 246 (specifying that the "*legislature*" may provide for the "narrowing function" by statute (emphasis added)); *Zant*, *supra*, at 878 ("*[S]tatutory* aggravating circumstances play a constitutionally necessary function at the stage of *legislative* definition: they circumscribe the class of persons eligible for the death penalty" (emphasis added)).

The second aspect of the capital decisionmaking process, the "selection decision," determines whether a death-eligible defendant should actually receive the death penalty. *Tuilaepa*, *supra*, at 972. In making this individualized determination, the jury must "consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Ibid.*; see also *Marsh*, *supra*, at 173–174 ("[A] state capital sentencing system must . . . permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime"). This second aspect of the capi-

tal punishment decision—the selection requirement—is not before us.

## II

Our precedent makes clear that the legislature may satisfy the "narrowing function . . . in either of . . . two ways." *Lowenfield*, 484 U. S., at 246. First, "[t]he legislature may itself *narrow the definition of capital offenses . . . .*" *Ibid.* (emphasis added). Second, "the legislature may more broadly define capital offenses," but set forth by statute "aggravating circumstances" which will permit the "jury . . . at the penalty phase" to make "findings" that will narrow the legislature's broad definition of the capital offense. *Ibid.*; see also *Tuilaepa*, *supra*, at 972 ("The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)"). The petitioner here, Abel Daniel Hidalgo, contends that the Arizona Legislature has failed to satisfy the narrowing requirement through either of these two methods.

## A

Consider the first way a state legislature may satisfy the Constitution's narrowing requirement—namely, by enacting a narrow statutory definition of capital murder. Some States have followed this approach. For example, in *Lowenfield*, this Court upheld Louisiana's use of this method because it concluded that the State's capital murder statute narrowed the class of intentional murderers to a smaller class of death-eligible murderers. 484 U. S., at 246. Specifically, Louisiana's capital murder statute was limited to cases in which "'the offender'" not only had "'specific intent to kill or to inflict great bodily harm'" but also (1) targeted one of three specifically enumerated categories of victims (children, "'a fireman or peace officer engaged'" in "'lawful duties,'" or multiple victims); or (2)

was "'engaged in the perpetration or attempted perpetration of'" certain other serious specified crimes; or (3) was a murder-for-hire. *Id.*, at 242 (quoting La. Rev. Stat. Ann. §§14:30(A)(1)–(5) (West 1986)). The *Lowenfield* Court also noted that Texas' capital murder statute "narrowly defined the categories of murder for which a death sentence could be imposed." 484 U. S., at 245; see also *Jurek* v. *Texas*, 428 U. S. 262, 271 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (upholding the Texas capital murder statute, which made "a smaller class of murders in Texas" death eligible).

Unlike the Louisiana and Texas statutes, Arizona's capital murder statute makes all first-degree murderers eligible for death and defines first-degree murder broadly to include all premeditated homicides along with felony murder based on 22 possible predicate felony offenses. See Ariz. Rev. Stat. Ann. §§13–1105(A)(1)–(2) (2010) (including, for example, transporting marijuana for sale). Perhaps not surprisingly, Arizona did not argue below and does not suggest now that the State's first-degree murder statute alone can meet the Eighth Amendment's narrowing requirement.

B

Because Arizona law broadly defines capital murder, the State has sought to comply with the narrowing requirement through the second method—namely, by setting forth statutory "aggravating circumstances" designed to permit the "jury . . . at the penalty phase" to make "findings" that will narrow the legislature's broad definition of the capital offense. *Lowenfield*, *supra*, at 246. The Arizona Legislature has set forth a list of statutory aggravating factors that the jury must consider "in determining whether to impose a sentence of death." Ariz. Rev. Stat. Ann. §13–751(F) (Cum. Supp. 2017); see Appendix, *infra*. And under Arizona law, a person convicted of first-degree

murder may be sentenced to death only if at least one of these aggravating factors is present. §13–752(E).

In this case, the petitioner sought an evidentiary hearing to establish through witnesses, expert testimony, and documentary evidence that the statutory aggravating circumstances set forth in §13–751(F) apply to virtually every first-degree murder case in the State. The state trial court consolidated the petitioner's motion for an evidentiary hearing with similar motions filed by 17 other first-degree murder defendants. See Brief in Opposition 4. Unlike the petitioner, the other defendants had committed their crimes after the Arizona Legislature increased the number of statutory aggravating factors from 10 to 14. Compare Ariz. Rev. Stat. Ann. §13–703(F) (2001) (10 aggravators) with Appendix, *infra* (14 aggravators).

In his request for a hearing, the petitioner pointed to, among other things, evidence he obtained through public records requests regarding more than 860 first-degree murder cases in Maricopa County (the county where he was charged) between 2002 and 2012. As the Arizona Supreme Court noted, this evidence indicated that "one or more aggravating circumstances were present in 856 of 866" cases examined. 241 Ariz. 543, 550, 390 P. 3d 783, 789 (2017). In other words, about 98% of first-degree murder defendants were eligible for the death penalty. The petitioner adds in his briefing before this Court that this is true under either the 10 aggravating factors in effect when he was sentenced or the 14 factors set forth under the expanded provisions Arizona has since adopted. See Reply Brief 5 (citing C. Spohn, Aggravating Circumstances in First-Degree Murder Cases, Maricopa County, AZ: 2002–2012). Narrowing an impermissibly broad capital murder statute by about 2% is not, the petitioner says, sufficient under this Court's precedents.

The state trial court denied the petitioner's request for an evidentiary hearing, and the Arizona Supreme Court

affirmed. 241 Ariz., at 548–549, 390 P. 3d, at 788–789. However, the Arizona Supreme Court did not dispute the petitioner's evidence. It assumed that "Hidalgo is right in his factual assertion that nearly every charged first degree murder could support at least one aggravating circumstance." *Id.*, at 551, 390 P. 3d, at 791.

C

Despite assuming that the aggravating circumstances fail to materially narrow the class of death-eligible first-degree murder defendants, the Arizona Supreme Court nevertheless concluded that the State's death penalty system meets the Constitution's narrowing requirement. It said that the petitioner was "mistaken . . . insofar as he focuses only on the legislatively defined aggravating circumstances" because use of those circumstances "is not the only way in which Arizona's sentencing scheme narrows the class of persons eligible for death." *Id.*, at 551–552, 390 P. 3d, at 791–792. The Arizona Supreme Court mentioned five other ways it thought Arizona's death penalty system meets the Constitution's narrowing requirement. They were: (1) Arizona's first-degree murder statute; (2) the "identified aggravating circumstances"; (3) the fact that the State must prove "one or more" of the "alleged aggravating circumstances" "beyond a reasonable doubt"; (4) the existence of "mandatory appellate review"; and (5) Arizona's statutory provisions applicable to "individualized sentencing determinations" through consideration of "mitigating circumstances." *Id.*, at 552, 390 P. 3d, at 792.

We have considered (and rejected) the first of these other ways since Arizona's first-degree murder statute does not "provid[e] for categorical narrowing at the definition stage." *Zant*, 462 U. S., at 879. What about the second way—that is, narrowing by means of the "statutory aggravators"? Again, the Arizona Supreme Court assumed that those factors do not, in fact, narrow the class

of death-eligible first-degree murder defendants. Instead it assumed that "Hidalgo is right in his factual assertion that nearly every charged first degree murder could support at least one aggravating circumstance." 241 Ariz., at 551, 390 P. 3d, at 791. That assumption, without more, would seem to deny the constitutional need to "genuinely" narrow the class of death-eligible defendants. *Zant*, *supra,* at 877. Moreover, the third and fourth narrowing methods the Arizona Supreme Court invoked are basically beside the point—they do not show the necessary *legislative* narrowing that our precedents require. And the final other way (individualized sentencing determinations) concerns an entirely different capital punishment requirement—the selection decision—which is not at issue in this case. See *supra*, at 2–3.

Finally, the Arizona Supreme Court seemed to suggest that *prosecutors* may perform the narrowing requirement by choosing to ask for the death penalty only in those cases in which a particularly wrongful first-degree murder is at issue. See 241 Ariz., at 551–552, 390 P. 3d, at 791–792. However, that reasoning cannot be squared with this Court's precedent—precedent that insists that States perform the "constitutionally necessary" narrowing function "at the stage of *legislative* definition." *Zant*, *supra*, at 878 (emphasis added); see also *Tuilaepa*, 512 U. S., at 979; *Lowenfield*, 484 U. S., at 246; *Ramos*, 463 U. S., at 1008.

\*      \*      \*

Although, in my view, the Arizona Supreme Court misapplied our precedent, I agree with the Court's decision today to deny certiorari. In support of his Eighth Amendment challenge, the petitioner points to empirical evidence about Arizona's capital sentence system that suggests about 98% of first-degree murder defendants in Arizona were eligible for the death penalty. That evidence is unrebutted. It points to a possible constitutional prob-

lem. And it was assumed to be true by the state courts below. Evidence of this kind warrants careful attention and evaluation. However, in this case, the opportunity to develop the record through an evidentiary hearing was denied. As a result, the record as it has come to us is limited and largely unexamined by experts and the courts below in the first instance. We do not have evidence, for instance, as to the nature of the 866 cases (perhaps they implicate only a small number of aggravating factors). Nor has it been fully explained whether and to what extent an empirical study would be relevant to resolving the constitutional question presented. Capital defendants may have the opportunity to fully develop a record with the kind of empirical evidence that the petitioner points to here. And the issue presented in this petition will be better suited for certiorari with such a record.

APPENDIX

Ariz. Rev. Stat. Ann. §13–751(F) (Cum. Supp. 2017)

"F. The trier of fact shall consider the following aggravating circumstances in determining whether to impose a sentence of death:

"1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

"2. The defendant has been or was previously convicted of a serious offense, whether preparatory or completed. Convictions for serious offenses committed on the same occasion as the homicide, or not committed on the same occasion but consolidated for trial with the homicide, shall be treated as a serious offense under this paragraph.

"3. In the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense.

"4. The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

"5. The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.

"6. The defendant committed the offense in an especially heinous, cruel or depraved manner.

"7. The defendant committed the offense while:

"(a) In the custody of or on authorized or unauthorized release from the state department of corrections, a law enforcement agency or a county or city jail.

"(b) On probation for a felony offense.

"8. The defendant has been convicted of one or more other homicides . . . that were committed during the commission of the offense.

"9. The defendant was an adult at the time the offense

was committed or was tried as an adult and the murdered person was under fifteen years of age, was an unborn child in the womb at any stage of its development or was seventy years of age or older.

"10. The murdered person was an on duty peace officer who was killed in the course of performing the officer's official duties and the defendant knew, or should have known, that the murdered person was a peace officer.

"11. The defendant committed the offense with the intent to promote, further or assist the objectives of a criminal street gang or criminal syndicate or to join a criminal street gang or criminal syndicate.

"12. The defendant committed the offense to prevent a person's cooperation with an official law enforcement investigation, to prevent a person's testimony in a court proceeding, in retaliation for a person's cooperation with an official law enforcement investigation or in retaliation for a person's testimony in a court proceeding.

"13. The offense was committed in a cold, calculated manner without pretense of moral or legal justification.

"14. The defendant used a remote stun gun or an authorized remote stun gun in the commission of the offense.

[Note: Since 2001, the Arizona Legislature has added aggravators 11 through 14.]